**In re GLOBE DISTRIBUTORS,
INC., Debtor.**

**GLOBE DISTRIBUTORS,
INC., Plaintiff,**

**v.**

**ADOLPH COORS COMPANY,
Defendant.**

**Bankruptcy No. 88–807.
Adv. No. 88–97.**

United States Bankruptcy Court,
D. New Hampshire.

May 13, 1991.

William S. Gannon, Wadleigh, Starr Offices, Manchester, N.H., for Globe Distributors, Inc.

Peter Mosseau, Orr and Reno, Concord, N.H., for Adolph Coors Co.

Dennis Bezanson, South Portland, Me., Trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding involves the alleged wrongful termination of a New Hampshire beer distributor by the Adolph Coors Company. The distributor is no longer in business and is a debtor in this court. After deciding some preliminary motions, the Court held a trial from October 15–19, 1990, and heard oral arguments on October 25, 1990.[1] Due to the extensive factual and legal issues involved in this case, I took the matter under submission upon completion of post-trial briefing on December 28, 1990.

Coors terminated Globe as its distributor on October 18, 1988 without any prior notice. Upon the evidence submitted at trial Coors sought to justify the termination without notice upon the ground of "insolvency" and the ground of "non-payment of any account due" under the provisions of Article III(1) of the Distribution Agreement between the parties. Article III(1) does provide for a termination without notice for various egregious events involving the distributor, including among other things violation of laws and regulations, conviction of a felony, and revocation of license. This provision is to be distinguished from Article IX(2) of the Distributorship Agreement which provides for termination upon breach or a default in any term or condition of the agreement upon written advance notice during which the distributor "shall have a period of not more than 90 days from receipt of such notice to correct such breach or default to Coors' satisfaction."

As will be developed later in this opinion, the evidence submitted by Coors at the trial fell far short of establishing "insolvency" in the asset-liability sense appropriate for an egregious event justifying termination without notice under an appropriate construction of the agreement between the parties. Moreover, the evidence supports a finding that Coors had no information prior to October 18, 1988 which would have justified a reasonable belief that Globe was insolvent in the asset-liability sense. Accordingly, the primary issue for decision by

---

1. Prior to trial on February 7, 1990 the Court denied a motion to dismiss a Count in the Plaintiff's complaint asserting liability under the New Hampshire Consumer Protection Act, N.H. RSA § 358–A, for an unfair or deceptive trade practice. The defendant was seeking a ruling that the conduct at issue was statutorily exempt from the scope of this statute. See N.H. RSA § 358–A:3. On the eve of the trial, the Court also ruled, in the context of a motion in limine, that as a matter of law the ground of "insolvency" justifying termination of the distributorship would require a showing of insolvency in the asset-liability sense.

this Court, as actually presented by the evidence in the record, is whether the "non-payment of any account due" ground asserted by Coors was well taken and was legally sufficient to justify termination without notice. There are additional issues regarding waiver and estoppel, and alternative causes of action asserted by Globe, which also will be considered.

## STATEMENT OF FACTS

Globe Distributors, Inc. ("Globe") was a beer distributor located in Manchester, New Hampshire. Its sales territory covered approximately one-third of the state of New Hampshire, principally in the south and west, being the most populous part of the state. The company's stock was owned by Alphonse Vitale (91 percent) and Robert MacKnight (9 percent). Although Globe owned many of the assets it used for its business, it leased its warehouse from Vitale. In 1982, the company had $6 million in annual sales, which was comprised of about 650,000 cases of beer. Globe sold Schlitz and a few imports.

On October 25, 1985, Globe entered into a five year agreement with the Adolph Coors Company ("Coors") to distribute Coors beer. Its sales instantly more than doubled. To be a Coors distributor, however, Globe had to invest approximately $1.1 million in installing a refrigerated cooler, insulating trucks, and buying special forklifts. Most of these changes were required by Coors because Coors believed its products needed to be refrigerated to enhance quality. Coors is unique among brewers in requiring that its distributors have refrigerated warehouse storage facilities.

By the spring of 1988, Globe had annual sales of close to $20 million, which comprised about 2,000,000 cases, 1.2 million of which were Coors. At this time, Globe was considered a very good distributor by Coors in terms of market penetration. Globe had achieved a ranking varying between second and third among distributors of Coors beer in the Boston area marketing region.

In the summer of 1988, Globe experienced a cash flow problem.[2] The problem proved to be highly ironic, in light of subsequent developments, since it arose primarily from Globe taking advantage of an opportunity to sell considerably more Coors beer in its area due to a strike by employees at the Miller beer distributorship. Globe ordered and sold much more Coors beer during the strike. However, due to a quirk in the computerized billing system employed by Coors, the credit terms for Globe to pay for the beer supplies actually were severely *curtailed* rather than increased due to the low inventories that Globe was showing in its daily reports to Coors. The low inventories were showing because the beer was coming in and going out of its facility so quickly. Moreover, at about the same time, Coors revised its shipment method with regard to beer supplies which had the effect of causing Globe to buy an extra weeks inventory at a cost of about $300,000, at a time when the Miller strike was being settled and therefore caused a slowdown in the stepped-up Coors' sales. The summer was the busiest selling season so cash was already short, due to advance purchasing, and receivables were high.

Globe did not have sufficient working capital, i.e. "turn-around" monies available directly, or by a line of credit, sufficient to cover immediately the cash flow problems summarized above. Amoskeag Bank, its lender under a line of credit, would not increase the existing line of credit since it had indicated earlier in 1988 that it wanted Globe to obtain an alternative bank lending facility.

Consequently, Vitale called Dan Brown, the Coors' Credit Manager, on July 29, 1988 and alerted him to the problem. Brown granted Vitale's request to extend credit terms of the $642,069.97 that could not be immediately paid, to August 15th and August 22nd, but Globe couldn't make

2. Terms of payment with Coors varied between zero and twenty one days depending on a Coors' formula. The money would be transferred to Coors by electronic fund transfer out of a Globe bank account.

all of the payments projected. It was apparent to both Coors and Globe at this point that Globe's cash flow projections were proving unreliable and a Coors' employee named Nancy Mammorella, who was at Globe's facility at the time, was assigned the task of working-up more reliable figures. She was the Manager of Distributor Economics for Coors and assisted distributors in trying to be more profitable. In mid-August, she constructed a cash flow analysis that would help Globe pay its beer debt in a timely fashion while staying current on new invoices. The analysis scheduled payments on the remaining balance of the debt to be completed by September 20, 1988.

Vitale and Globe's accountant, Kevin Howe, agreed to the repayment schedule reflected in the analysis after a rather quick and sketchy review and one correction. As it turned out, there were significant errors in the analysis, including a substantial error in the beginning cash balance. The parties understood the analysis was subject to change depending on the realities of Globe's business. Consequently, Globe made some but not all payments according to schedule by September 20, 1988. On that date, the original $640,000 balance had been reduced to approximately $200,000 and Globe was current on payments for all other beer ordered during the interim.

Coors asked to have a meeting on September 30th primarily because a Coors' employee in New Hampshire noticed a foreclosure notice on the warehouse, which was owned individually by Vitale, but also because Coors wanted to clean up the debt. Between September 20th and 30th, Globe continued to make payments on the outstanding debt which Coors accepted.

At the September 30th meeting, Globe's attorney, William Tucker, explained that the foreclosure would be delayed. Globe's accountant, Howe, then stated business was as usual, but Globe's bank wanted them to find a new lender and Globe was optimistic that Indian Head Bank would refinance based on initial conversations. Globe asked for help from the Distributor Economics Group, which was scheduled to come in shortly, but Coors refused at this time. Coors suggested that Vitale put more capital into the business and Vitale agreed. Globe also suggested all of their financial problems could be solved by selling off the Keene, New Hampshire portion of its territory. Globe said it would start talking to potential buyers. In addition, Globe mentioned that it might sell the entire business, but this was to be strictly a last resort. Finally, Globe mentioned the possibility of finding an equity investor.

At no time during the September 30th meeting did Coors make a demand for payment of the outstanding debt in the sense of establishing a deadline for repayment beyond which Coors would be free to terminate the distributorship without any further notice. The Coors' representatives did make it abundantly clear that they were concerned about the continuing inability to clean-up the remaining balance on that debt and that they wanted their money. However, by this time Coors was at least equally concerned about the foreclosure situation with regard to the warehouse and Globe's and Vitale's other financial problems as opposed to the question of the relatively minor remaining balance on the outstanding debt.

Internal analysis by Coors' personnel on September 27, 1988 had indicated that the sales trends with regard to the Globe operation were "encouraging" but that Globe needed "to capitalize on this by cutting expenses" and that Globe "could be a very viable business if expenses were brought under tighter control and their bank support could be strengthened." At the time of the September 30th meeting, Globe still had not been able to arrange alternative bank line of credit financing, although the Indian Head Bank had indicated that they would favorably consider taking over the Globe account if Vitale could resolve his own financial problems relating to the warehouse foreclosure and if Globe could improve its working capital position perhaps by selling off the Keene portion of its distributorship.

As a result of the September 30th meeting, Terry Day, the Regional Sales Director for the Eastern Region, sent Globe a letter dated that day asking that Globe do certain things. Specifically, Coors asked: that Vitale invest additional capital of $75,000 to $100,000 by October 5; that Globe submit a financial plan by October 11th, including a 12–month pro forma income statement and a back up plan if Indian Head Bank did not refinance; and, that Globe submit a revised cash flow to retire the outstanding debt which had been reduced to a balance of approximately $186,000 at that date. The letter concluded: "upon receipt of these items and your remaining *current* with Adolph Coors Company payment obligations, we will evaluate the options available to us and inform you of our next steps within 5 working days."[3]

All the requests made by Coors in the September 30th letter were completed by Globe, although the back up plan was rather sketchy. The sum of $77,337.00 in additional capital was injected into Globe by Vitale. Globe informed Coors that there were . more meetings with Indian Head which indicated "the situation appears favorable." In reality, Indian Head had given no actual assurances to Globe and that bank was still looking for a capital injection from the sale of the Keene territory before it would look favorably upon a commitment to take over the line of credit financing from Amoskeag. Globe reported discussions with possible Keene purchasers. The cash flow analysis provided by Howe showed the $186,000 debt could be paid off starting October 18 and ending on October 31. Globe was continuing business as usual, with no particular operational problems other than the looming foreclosure on the warehouse scheduled for October 21, 1988.[4]

In one correspondence dated October 5, 1988, Vitale wrote to Coors and indicated that he would comply with the requested actions including providing a "revised workable cash flow analysis to retire 'past due' Adolph Coors balance which is approximately $186,000 as of this date." The inclusion of the quote marks around the reference to "past due" clearly indicated that Globe did not consider the balance owing as a "nonpayment" within the meaning of the contractual language or the statutory provisions relevant thereto, which was a reasonable belief in that Coors had not yet taken the required action to notify the New Hampshire Liquor Commission of unpaid brewery bills pursuant to NH RSA 181:23.

Meanwhile, Coors had its own agenda. Mammorella, the day after the September 30th meeting, went to the Globe offices and started working on another cash flow projection that would cover the period through October 31st. When she brought her analysis back to Golden, Colorado, the executives there believed her cash flow analysis was more reliable than Howe's. Her cash flow had indications of continuing cash flow problems for Globe in the future. Coors' management also thought there was credibility to a rumor that Globe was seriously considering selling its entire distributorship to three companies that primarily deal with Miller beer.[5] This greatly concerned Coors because they did not want a fragmented distributorship, nor did they. want "Miller houses" responsible for selling their beer due to their reputed financial weaknesses. Coors didn't have confidence that Vitale's attorney could stop the foreclosure of the warehouse, nor did they see any refinancing commitment. They thought bankruptcy was realistic, which

---

**3.** It should be noted that notwithstanding the emphasis on the word "current" in this letter, Globe at all times from July of 1988 through the termination meeting of October 18, 1988 *was* in fact current with Coors on all billings *other than* the cash flow problem debt stemming from the July 1988 events.

**4.** Globe had scheduled an October 20, 1988 hearing in state court on a motion requesting

the entry of an injunction against the scheduled foreclosure sale.

**5.** No credible evidence was submitted at trial that indicated that Globe in fact was considering selling its entire distributorship at that time. It was considering selling off the Keene area portion of its distributorship not only for a capital infusion but because of excessive costs in servicing that relatively remote area.

they feared due to past problems with distributors in bankruptcy.

Regarding Vitale, Coors learned that Vitale had large stock market losses and was in the midst of a divorce proceeding. Still, his financial statement showed a net worth of $1,355,000, with $280,300 in securities and $367,700 in a vested pension plan that could be liquid in 24 hours. Moreover, Vitale's personal loan from Globe, which stood at $500,000 in August of 1988, had been paid down to approximately $70,000 by October of 1988.

On October 7, 1988, internal analysis by Coors' personnel listed various options available for resolution of the Globe situation including the possibility that Globe would sell the business to Coors in whole or in part, with "possible territory separation of Keene and Manchester." This internal analysis also indicated that Coors' executives were aware of a prior chapter 11 proceeding in this Court involving the Miller distributor in which that distributorship was acquired for no costs due to termination prior to the bankruptcy filing. The memorandum of October 7, 1988, summarizing this analysis, was from Gary Stiles, who was Division Sales Manager for New England, and an individual whose views as to distributor values and operation were relied upon by senior Coors' executives. The memorandum concludes, prior to receiving the financial data and projections from Globe, that "if this situation is allowed to go past next week with no improvement or viable action plans submitted by Al Vitale, we could be looking at a bankruptcy situation with Adolph Coors company holding approximately $400,000 worth of debt. The marketplace is currently being serviced but will deteriorate within two weeks."

On October 12, 1988, Coors' attorney, Earle Bellamy, called Globe's attorney, William Tucker, to discuss the Globe situation. Tucker advised that the Amoskeag Bank would continue as lender to the business, at least temporarily, but would like the loans

moved to another bank. He indicated that the Indian Head Bank was still interested in taking over the loans but would not commit anything until Vitale cleaned up his personal financial problems. Tucker further explained that they were having a difficult time with the second mortgagee who had the foreclosure scheduled on the warehouse; that mortgagee was "playing hardball" in that it essentially was unsecured since the $2 million dollar value of the warehouse was fully collateralized by the first mortgage position held by Amoskeag. Tucker further indicated an action plan whereby the Keene area would be sold with at least a purchase and sale agreement that would serve to get the foreclosure stopped, with $400,000 of the projected $800,000 to $900,000 purchase price being used to satisfy the second mortgagee situation and other personal debts of Vitale, with the balance to be used to build up the working capital monies of Globe. If that could not be accomplished in time, Vitale would file an individual chapter 11 proceeding for which bankruptcy counsel had already been retained. The second mortgagee had been threatened with that prospect; as an undersecured secured creditor it could be dealt with under Bankruptcy Code provisions in a way not available in the mortgage foreclosure situation.[6]

Subsequent to the Tucker–Bellamy phone conference, Coors management made a firm decision to terminate Globe and buy the distributorship in one transaction. While there are various internal memorandums between Coors personnel indicating that Coors only considered that as one option prior to the October 18, 1988 meeting, and while certain Coors witnesses testified to the same effect during the trial, I do not find it credible that Coors had any other course of action in mind following the Tucker–Bellamy conference. It is abundantly clear in this record that Coors' overriding concern at that point was to avoid at all cost giving Globe any opportunity to

---

6. When appraised of the possible Vitale chapter 11 proceeding, Bellamy asked Tucker what would happen to the Amoskeag loans if Vitale, as personal guarantor of the Globe–Amoskeag

loans, were to file chapter 11 proceedings. Tucker indicated that he felt Amoskeag would work with them, but there were no guarantees in that regard.

litigate or to file a reorganization proceeding under the Bankruptcy Code. I believe that they concluded, as Bellamy's question implies, that while Vitale might actually intend to file a chapter 11 petition for himself alone, that inevitably Globe itself would be drawn into reorganization proceedings. I believe also that the evidence supports a finding that Coors fully expected that Globe's reaction to a firm demand for payment with a fixed deadline would result in a chapter 11 filing if the deadline could not be met, to protect Globe's investment in the distributorship.

On October 14, 1988, Scott Whitley, the Manager of the Distributor Development Department, requested approval from senior Coors' management for authorization to purchase the Globe distributorship through an affiliate corporation. His memorandum indicated a proposal to "make an initial offer of $5,605,000." The memorandum further indicates fair market value of the distributorship at between $5,000,000 to $8,000,000. Whitley was the Coors' employee relied upon by senior Coors' management to value distributorships around the country. Reacting to the unproven rumor that Globe had been negotiating with the "Miller houses", the Whitley memorandum indicates that "we have to act by 10/18 to avoid 'Miller' scenario" and indicates among various options available that Coors "terminates distributor prior to Miller deal or bankruptcy." The memo concludes by stating that if the termination option is to be pursued "need to move by 10/18 to avoid 'Miller' scenario."

Coors' President, Peter Coors, authorized purchase of the Globe distributorship on October 14, 1990. Coors requested a meeting with Globe at 2 p.m. on October 18, 1988 to be held at a hotel in Manchester, New Hampshire, but did not inform Globe what the meeting was to be about, other than what could be gleaned from the reference in the September 30, 1988 letter that

Coors would "inform you of our next steps within five working days" after receiving the requested data from Globe. Globe reasonably assumed, in these circumstances, that the meeting was to be about the general financial condition of the company and its ability to pay the debt in a timely fashion. Indeed, on the morning of the 18th, Globe paid Coors $30,000 on the debt, which with various adjustments reduced the outstanding debt to $160,000.

Without further belaboring the point, internal memorandums between Coors' personnel in evidence, and the testimony at the trial, support a finding, here made, that Coors deliberately structured the meeting of October 18, 1988 in a fashion and in a time frame which would leave Globe no realistic possibility of filing a chapter 11 petition under the Bankruptcy Code when presented with the "triple-whammy" of a termination notice, a filing of a delinquency notice with the liquor commission, and an offer to purchase the Globe distributorship, in a simultaneous fashion late in the afternoon away from the Globe premises and the Globe attorneys' offices. This strategy worked very well and achieved the result Coors intended. To that end, it was essential, and was so understood by Coors' personnel, that there should be no prior indication that such drastic action was contemplated.

To prepare for the October 18th meeting, Coors on October 17th prepared a proposed press release announcing the purchase of Globe. Coors also prepared a termination letter. In addition, Coors prepared a letter to be given to the Liquor Commission upon Bellamy's command stating that Globe has not paid a beer bill in the statutory allowed period of thirty days.[7] Delivery of such a letter automatically prohibits further shipments of beer from a brewer to a distributor until the debt has been paid and Coors knew this.[8] Finally, Coors arranged for a

---

7. NH RSA 181:23(I) states that "each holder of a certificate of approval or manufacturer's permit shall report to the Commission the name ... of any holder of wholesaler's permit who is delinquent in making payments of accounts within 30 days from the date of delivery ..."

8. Actually, the statute gives the Liquor Commission the discretion to stop deliveries but the evidence established that the parties all believed that this would happen and that was the normal Commission response. The fact that it did not

replacement distributor, Capitol Distributors of Concord, New Hampshire.

The meeting of October 18, 1988 began at approximately 2:15 p.m. The meeting started with Coors acknowledging that they received the $30,000 paid that morning, but then the discussion focused on Globe's litany of financial problem, which lasted several hours. At some point, Duane Alderson may have made his routine "we want our money" statement, but nobody understood that as a serious demand for full immediate payment of the outstanding balance.[9] Nevertheless, Globe did mention that they planned to pay off the outstanding debt by October 31, 1988.

Shortly before 4 p.m., Bellamy took center stage and said that although Coors believed Globe was sincerely trying to solve its financial problems Coors no longer thought Globe could remain viable and properly service Coors in the marketplace. Bellamy announced Coors was going to shut off shipment of product to Globe. The Globe team was stunned by this action, and the record fully supports the reality of that reaction in the circumstances. Vitale sputtered that such action would "drive us out of business." Since the Coors line represented approximately 65 percent of the Globe business it was clear to all parties at the meeting that Coors was in effect saying that Globe would be closed down since the remaining business could not begin to cover operating costs and overhead.[10]

Coors immediately responded by offering to buy the distributorship for $4.1 million. The Globe team was further dismayed by this low number and Vitale remarked Coors had them "with our backs to the wall." The Globe representatives remonstrated again in somewhat of a daze that they would need at least another one-half million dollars to cover the secured creditor on the warehouse. Coors immediately increased its offer to $4.6 million. At that point, the Globe team asked for an opportunity to leave the meeting and discuss these developments alone.

As the Globe people were leaving, at about 4:30 p.m., Bellamy advised that "you should know" that he had given the signal for the delivery of the delinquency letter to the Liquor Commission and also handed over at that point the termination letter. This produced another general uproar on the part of the Globe people who remonstrated that it was not an example of the fair dealing that Coors had earlier at all meetings indicated was its policy and in fact was totally uncalled for in light of their prior discussions. Nevertheless, the Globe people did proceed to their separate meeting to discuss these developments and Coors' offer to purchase.

The termination letter delivered at the October 18th meeting reads as follows:

HAND DELIVERED

October 18, 1988

Mr. Alphonse J. Vitale

Globe Distributors, Inc.

159 Frontage Road

PO Box 4533

Manchester, NH 03108

Dear Mr. Vitale:

Your distributorship is currently in breach of your Distributor Agreement with the Adolph Coors Company, and we must advise you that your Distributor Agreement with the Adolph Coors Company is terminated pursuant to Article III(1) and R.S.A., 181:39 effective as of 5 p.m. today.

in fact happen is explained by the fact that the Commission knew a sale was pending.

9. Coors at the October 18th meeting never demanded a specific response to the question as to when the rest of the monies would be paid. They knew that Vitale had sufficient liquid assets to pay it within 24 hours but did not in my judgment want to precipitate that response at that point. Accordingly, based upon the more credible testimony of the various witnesses who conflict on this point, I conclude that other than

Mr. Alderson's initial comment, if it was made, there was never any specific request to Coors at the October 18th meeting which would have required an immediate response prior to the time that Coors provoked the general uproar by announcing that it was shutting off product.

10. RSA 181:23 also gives the liquor commission power to bar *all* delivery of products to a delinquent distributor—not limited to the product line involved in the delinquency.

As you know, your distributorship has several past due beer bills totalling more than $160,000 which you failed to pay prior to August 22, 1988 in compliance with Coors' written demands. In addition, based on the cash flow analysis you submitted in response to my September 30, 1988 letter, your cash flow is not sufficient to meet your normal operating expenses and pay the obligation owed to Coors. Additionally, the warehouse from which you are currently operating is subject to foreclosure on October 21, 1988, and you have not indicated any ability to cure the loan defaults leading to this foreclosure. Based upon the information you have provided, we have reason to believe that your distributorship is insolvent in addition to being unable to pay the accounts due and owing to Coors.

In addition to the grounds for termination, as stated above your performance in the market has not been in compliance with Coors' Distributor Agreement.

We will expect your cooperation in proceeding to a final settlement of accounts and surrender of inventory and supplies pursuant to Article X of the Distributor Agreement. Please coordinate these wind-up activities with our Division Office.

Sincerely,

T.O. Day

Field Sales Director

I believe Bellamy gave this letter at the time and manner indicated for two purposes: to avoid a bankruptcy, and to coerce a sale. The reference to insolvency in my judgment was merely a pretext and was not based upon any substantial indication that Coors knew of asset-liability insolvency on the part of Globe. With regard to the reference to the August 22, 1989 alleged payment deadline, that reference clearly is erroneous because Coors' letter of August 18, 1988 setting forth the revised payment schedule running to September 20, 1988 obviously waived any such deadline. Finally, the reference to other grounds for Coors' action in terminating the distributorship all involved asserted breaches of contract, which would have required a 90–day notice under Article IX(2) of the Distribution Agreement, and accordingly are not material to the question of the propriety of termination without notice.

In the meeting of the Globe team, they asked the attorney present, Tucker, if the termination notice was valid, and Tucker indicated he did not have the distributorship agreemnt or statutes available to make a determination.[11] They felt that Coors had made up their mind to terminate Globe whether or not Globe paid off the old debt, which in fact was true, and the best thing they could do at this time was to try to negotiate a fair sales price. It was also apparent to the Globe people that in view of the termination notice they no longer had the option of trying to sell off the Keene area as a step toward stopping the warehouse foreclosure. A satisfactory purchase agreement with Coors could serve the same purpose. While the Globe people met, Bellamy made a phone call to arrange for the delinquency letter to be sent.

The general meeting resumed and after some negotiation the parties reached an agreement on a $5.3 million sales price for the Globe distributorship. Both sides felt that that was a reasonable price for the distributorship, taking into consideration the prior investment and goodwill developed by Globe during the term of the distributorship.[12]

---

11. Tucker called his law office but due to the time could not get anyone to look up the pertinent documents for review.

12. The parties also had agreed on October 18th that something would shortly be worked out about the short-term supply of Coors in this distribution area. In the days following, Tucker asked Coors to revoke the termination but Coors refused due to stated concerns about state law relating to a temporary distributorship. So Globe entered into a Subdistribution Agreement with Capitol Distributors on October 31. This was not a good financial deal for Globe since all that happened is a Coors truck would drive to the Capitol warehouse, drop off an invoice, then deliver the product to Globe who was charged a .50 per case markup over the invoice by Capitol.

The next day, on October 19, 1988, Coors' representatives met with the Liquor Commission and discussed generally the idea of a sale. The Commission expressed concern that a state law prohibited a brewer from having any control over a distributor. They also mentioned a law that required any person owning a distributorship to have lived in the state for at least three years. They suggested Coors work with the Attorney General's office, and its attorney named Daniel Mullen, to structure the deal to comply with the law.

Later on October 19, 1988, Globe and Coors entered into a Memorandum of Understanding which outlined the basic terms of the sale whereby a subsidiary of Coors, Ford Street Management Corporation, would purchase Globe. The initial idea that then evolved was that Ford would finance a sale to a "key man" with eventual bank financing. The key man program was a new idea at Coors; it was designed to sell a distributorship to loyal Coors' employees. In this case, it was Gary Stiles, the Division Manager for the New England Division. To satisfy the residency requirement, MacKnight would be the principal of the company owning the assets, Scenic State, Inc., for three years. Vitale would agree to lease the warehouse. The closing date was November 15th.

Coors reviewed the financial records of Globe, and thought the key man idea was feasible. But Howe several days later showed them an error in their calculations that resulted in the plan no longer being feasible in the sense of Scenic State being able to get outside bank financing.

Coors subsequently, after the error in its calculations was discovered, interviewed prospective third-party purchasers. One purchaser who would pay $5.3 million looked promising, but he wanted Coors to finance a three year bridge loan of $2.2 million which Coors refused to do. There were two other possible purchasers, but Coors decided there was no suitable candi-

date that could close the deal quickly. The closing date was already pushed off to December 15th to accommodate this search.

Coors went back to the original key man idea. The parties cooperated with the state's attorney Mullen, but Mullen left the question of whether there was too much brewer interest in the proposal to the Liquor Commission. A purchase and sale agreement was signed on December 15; all the documents, including mutual releases of any claims against each other, and the purchase price, were held in escrow subject to Liquor Commission approval. The Commission met on December 20th and voted against the proposal, largely due to an objection filed by Clark Corson, the President of the New Hampshire Wholesale Beverage Association. His objection was based on the indirect control of a brewer through the financing and a fear that the deal would be a bad precedent encouraging more such termination/sale/transfer transactions by brewers exerting undue leverage on distributors.[13] Globe filed a motion for reconsideration the next day. However, Coors did not support it and reconsideration was denied. Coors told Globe on December 21st that the deal was off and they were appointing Capitol as their new distributor. Globe filed a chapter 11 petition with this Court on December 22, 1988. Globe sought injunctive relief requesting that it be returned into possession of its distributorship operation. Such injunctive relief was denied after hearing on January 17, 1989.

## LEGAL THEORIES

Globe alleges various causes of action: wrongful termination pursuant to the agreement and statute; violation of the covenant of good faith and fair dealing in the manner of termination and execution of the sale; statutory compensation for termination; and, double or treble damages for

---

**13.** The record indicates that the Chairman of the Liquor Commission would have approved the deal if the Coors subsidiary had promised to a "drop-dead date" of six months to remove itself from any financial involvement in the distributorship. However, Coors refused to agree to any fixed deadline since a prospective purchaser would take advantage of its weak bargaining position given the deadline.

violation of the New Hampshire Consumer Protection Act. Coors' only affirmative defenses are waiver and estoppel regarding the claim of wrongful termination.

### I. *Wrongful Termination*

#### A. Contract and Statute

The distribution agreement provides in Section IX under the heading "Termination" the following:

(1) This Agreement may be terminated by either party by the service upon the other party of at least 30 days' advance written notice of termination.

(2) If Coors shall determine that Distributor has breached or is in default of any term or condition of this Agreement, then Coors shall so notify Distributor in writing, specifying the grounds constituting such breach or default. Thereupon, except as provided in Article III(1) herein, Distributor shall have a period of not more than 90 days from receipt of such notice to correct such breach or default to Coors' satisfaction. In the event that Distributor shall fail or refuse to correct such breach or default to Coors' satisfaction within the said period, or as the same may be extended by Coors at its discretion, Coors shall have the right to terminate the Distributor.

(3) If notice of termination is served, Coors shall have the right to refuse to supply beer to the Distributor after the mailing of such notice of termination by either party.

Article III(1), which contains the breaches Coors relies upon, states with regard to a distributor's responsibility as follows:

At all times to be aware of and to adhere to all local, state and federal laws and regulations applicable to Distributor's business pursuant to this Agreement. Violation of said laws and regulations; dishonesty; conduct involving moral turpitude; conviction of a felony, infamous crime, or any federal crime which is punishable in a federal penitentiary; revocation, nonrenewal, or suspension of Distributor's federal, state or local license or permit; or fraudulent conduct of Distributor in dealing with Coors or its products; insolvency; or nonpayment of any account due Coors, all shall be causes for immediate termination of Distributor at Coors' option. In such event, Coors shall have the right to make whatever immediate arrangements it deems necessary or expedient to provide for the sale and distribution of Coors beer products in Distributor's assigned territory.

Thus, under the agreement, if Globe was insolvent or did not pay any account due it could be terminated without notice. However, this agreement is subject to the preexisting protective provisions of a New Hampshire statute—the Wholesale Fair Dealing Agreements for the Distribution of Fermented Malt Beverages. NH RSA 181:36 et seq. (Subsection 44 specifically provides that "the provisions of this subdivision shall apply to agreements ... entered into" after July 21, 1981.) This statute provides that notwithstanding the terms of an agreement, no wholesaler shall be terminated "unless good cause can be established." NH RSA 181:38. Generally, a brewer must give written notice of an intent to terminate, and the wholesaler shall be given an opportunity to correct the claimed deficiency. However, a brewer may terminate a wholesaler without notice for: "The bankruptcy or insolvency of the wholesaler ... [or] ... Wholesaler's failure to pay any account when due, upon demand therefor, in accordance with agreed payment terms." NH RSA 181:39 (Subparagraphs I and VII).

■ Accordingly, while Article III(1) of the Agreement purports to allow termination for nonpayment of sums due without any demand or notice, that contractual provision is effectively modified by the preexisting statutory provisions of N.H. RSA 181:39(VII). In addition, even if no such statutory protection were available to a distributor, I would conclude that a prior demand for payment within a time fixed, and failure to comply by the distributor, is necessarily implicit in the contractual language with regard to nonpayment of

amounts as justifying termination without notice. The contractual language exists within a list of highly egregious events involving the distributor and could not be construed to permit forfeiture of a multi-million investment simply upon the fact of nonpayment isolated from all the surrounding circumstances.

Much of the evidence in this case concerns whether a demand was given for Globe to pay its past beer debt. I believe the statute uses the word "demand" to mean an unequivocal statement that the debt is overdue and must be paid within a reasonably fixed time, with an obvious explicit or implied representation in context that termination shall follow if the demand is not met. I find support for this ruling in a number of decisions. See *Snipes v. Snipes*, 55 N.C.App. 498, 286 S.E.2d 591 (1982), aff'd per curiam 306 N.C. 373, 293 S.E.2d 187 (1982); *Freitag v. Huiskamp*, 166 N.W.2d 915 (Iowa 1969); See also *International City Bank and Trust Co. v. Morgan Walton Properties, Inc.*, 675 F.2d 666 (5th Cir.), cert. denied 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 511 (1982); *H.C. Clark Implement Co., Inc. v. Wiedmer*, 389 N.W.2d 816 (S.D.1986); *Eskew v. Hawkins*, 619 S.W.2d 361 (Mo.Ct.App.1981); Cf. *R. Peter Decato's Case*, 117 N.H. 885, 379 A.2d 825 (1977); *Simon v. New Hampshire Savings Bank*, 112 N.H. 372, 296 A.2d 913 (1972).

Coors cites the decision in *Norris v. Morrill*, 43 N.H. 213 (1861) for the proposition that one making a demand for payment need not spell out explicitly the consequences of failure to comply. However, the reference in that opinion to that point was simply exposition describing an instruction to the jury in the trial below as to which no exception had been taken and accordingly was not an issue on appeal. (In any event, that purported principle of law is not at issue in this case.) The decision in *Norris v. Morrill*, and in the earlier case between the same parties reported in *Norris v. Morrill*, 40 N.H. 395 (1860), establishes a sensitivity on the part of the New Hampshire Court to fair play and appropriate warning to an allegedly delinquent party before forfeiture of a valuable investment should be permitted. See 43 N.H. at 217; 40 N.H. at 402.[14] Indeed, a proper demand requirement is essential to allow a distributor a chance to preserve its investment. Cf. *McGinnis Piano and Organ Co. v. Yamaha Int'l Corp.*, 480 F.2d 474 (8th Cir.1973).

■ Using this definition of demand, I believe no verbal or written "demand" for payment was given by Coors at any time.[15]

---

**14.** Indeed, the facts involved in the second *Norris v. Morrill* case bear an uncanny similarity to the key facts involved in the present case. In that case, the tenant had a commercial lease and was billed monthly for rent. The tenant fell behind in paying the rent by several months but made a partial payment of the accrued rent a couple months before a notice to quit was served. There was conflicting testimony of whether a demand was ever made. The landlord testified that he often asked for money, but was told by the tenant that he couldn't pay immediately, but would soon, and the landlord allowed the tenant to stay in possession. Then, a few days before the notice to quit was served the landlord testified his attorney presented the bills for payment, and the tenant objected because of the amount and because he thought the landlord would ask for the rent if he really wanted it. The tenant testified that no "demand" was ever made and he prevailed before a jury. The New Hampshire Court said:

We think the statement of facts was not sufficient to enable the court to say, that, as a matter of law, they necessarily amounted to a demand. If it was understood by the parties that no demand was intended, or if the lessor intended none, there would be no demand, whatever terms were used.
43 N.H. at 217.

**15.** Interestingly enough, a New Hampshire jury in 1861 touched on the differing meanings that can be attributed to the concept of "demand" as reported in *Norris v. Morrill*, 43 N.H. 213, 214 (1861). The jury in that case after retiring to consider whether the evidence supported the forfeiture of a lease by virtue of nonpayment of rent after demand sent the following letter to the presiding judge:

"Does the calling for rent or asking for rent in the ordinary way, and a neglect to pay the same, necessarily imply such a demand that the landlord may give his tenant legal notice to quit?"
To this inquiry the trial court answered as follows:
"It would depend upon the circumstances of the case what was understood by the parties, and what was intended by them. It would not necessarily imply such a demand, and yet

The entire relationship of the parties from July 29th forward until termination was one of working together to pay down the debt to the best of Globe's abilities. The entire course of discussion between the parties prior to the October 18th meeting had been generally cordial, due in part to the fact that Coors recognized that it itself had caused the cash flow snag in July by its computerized billing system and the change in its shipment methods, at a particularly inopportune time for Globe when it was trying to arrange an alternative bank line of credit financing. It did not help Globe in that endeavor to have a $642,000 "overdue account" with its major beer supplier on its books, even though the problem actually arose from Globe's attempt to increase Coors' market penetration during the Miller strike.

The cordiality of the relations between the parties obtained up to the October 18th meeting, in my judgment, notwithstanding the testimony that Coors' Credit Director, one Duane "Cash" Alderson, repeatedly began or ended each meeting with his notorious refrain "we want our money" which had earned him his somewhat jocular sobriquet in the beer business. While it is clear that Coors gave indications of its mounting impatience with regard to the delay in repaying the July cash flow shortage debt, at no time did the August 22nd repayment date or September 20th payment date become a firm deadline, nor was any demand made to pay the balance owing at any fixed date after those payment dates were not met.[16] The August 22nd date clearly was waived by Coors by virtue of the correspondence in August prior to that time. The September 20th date was waived by virtue of Coors' action in the September 30th letter requesting that Vitale infuse new capital into the company and take the other actions indicated prior to Coors considering "our next steps." The latter reference in context in my judgment could reasonably be interpreted by Globe as meaning that after review Coors would *then* determine whether it would give a final deadline for repayment or take any other action on the matter. Thus, Coors cannot rely on RSA 181:39(VII) to justify its termination of Globe on grounds of Globe's failure to pay any account when due "upon demand therefore, in accordance with agreed payment terms."

■ Regarding the insolvency ground set forth in the statute and asserted by Coors, the same analysis applied to the contractual language indicated above, i.e., such insolvency must be egregious in the sense of a concrete situation of assets-liability negative net worth as a clearly defined existing condition, would likewise apply in the statutory context. The proper test for insolvency in this context, involving forfeiture without notice of a distributorship investment, is a balance sheet test, as opposed to a test of a inability to pay debts as they come due. Kevin Howe testified that as of October 18th Globe had $542,000 in shareholders equity. The financial documents he provided Coors in October further demonstrated that Globe was a solvent company when terminated. The contrary testimony by Coors' witness on this point was confusing and of no substantial weight. The witness was under a misapprehension as to the appropriate

---

it might amount to a legal demand. It would depend upon the circumstances above stated."

The defendant lessor took exception to this instruction but the judgment in favor of the lessee was affirmed on appeal.

Essentially what I am saying in this opinion is that Coors' employee, Duane "Cash" Alderson, did in fact call for his money "in the ordinary way" but that did not constitute in "the circumstances of the case" a legal demand for the same.

16. Coors has made much of the fact that on October 18th when Coors informed Globe it was shutting off the product, Globe made no offer to pay the outstanding debt. I believe this fact is inconsequential because as Vitale testified he knew Coors wanted him terminated. Indeed, Bellamy testified if the debt had been paid Coors would have still tried to buy the company. The evidence is uncontroverted in the record that Vitale could have caused Globe to pay the remaining $160,000.00 balance within 24 hours by simply drawing down monies from his vested pension fund. The preemptive strike by Coors however, after accepting a $30,000 payment in the morning and still acting to terminate the distributorship in the afternoon, corroborates Vitale's conclusion that it would have been futile to make that offer.

factors to consider in determining the value of the enterprise. The evidence in this record establishes that while Globe recently had been losing money on a profit and loss basis, due primarily to its working capital shortage and lax control over expenses, it clearly was not yet insolvent in the required sense of that term. Thus, Coors cannot rely on RSA 181:39(I) to justify its termination of Globe.

From all of the foregoing, I conclude that Coors had neither a contractual nor a statutory basis for acting to terminate Globe without prior notice at the October 18, 1988 meeting, and that its actions in that regard amounted to a wrongful termination of the distributorship.

B. Duty of Good Faith and Fair Dealing

■ Apart from the agreement, as modified by the statute, I believe Coors' manner of termination violated the covenant of good faith and fair dealing. Coors' actions were "calculated and not inadvertent." *Devries v. St. Paul Fire and Marine Ins. Co.*, 716 F.2d 939 (1st Cir.1983). The actions were calculated to prevent Globe from possibly selling its company to distributors Coors did not feel could competently represent its trademark; to prevent a company from filing for bankruptcy which violates public policy, Cf. *In re Tru Block Concrete Products, Inc.*, 27 B.R. 486, 492 (Bankr.S.D.Cal.1983); and to coerce a sale. Globe was placed under time pressures that eliminated the bargaining that could have occurred under if it had any advance notice of the possibility of termination. Coors did have legitimate concerns based upon credible evidence about Globe's ongoing viability, but its manner of clandestinely plotting the termination of Globe for its own perceived benefit without giving Globe the chance to work itself out of its financial problems within a reasonable period was wrong. Coors' conduct violated the spirit of the agreement and statute. See *A.B.A. Distr. v. Adolph Coors Co.*, 542 F.Supp. 1272 (W.D.Mo.1982). Cf. *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902 (1st Cir.1987); *Fortune v. The National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977).

■ Coors makes an argument that the covenant of good faith cannot be invoked to *override* explicit contract terms relating to termination. Case law supports this contention. See, e.g., *General Aviation, Inc. v. The Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir.1990); *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672 (2d Cir.1985); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir.), cert. denied 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). See also *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187 (1989).

However, I am not ruling that the contract terms as modified by statute should be overridden. Rather, I believe Coors used the insolvency and nonpayment of debt as a pretext for terminating Globe for other reasons, when Coors had insufficient evidence to know whether Globe was insolvent or could not pay its debt within a reasonable period upon demand. This type of conduct is clearly within the scope of the good faith concept. See *ABA Distr., Inc. v. Adolph Coors Co., supra* at 1285; *Centronics Corp., supra* 132 N.H. at 145, 562 A.2d 187. The fact that Coors had legitimate grounds for concern about Globe's ongoing viability and various possible breaches of its contractual obligations is immaterial in this context. Those grounds could have been asserted under the contract and the statute as a basis for termination but would have required advance notice which Coors did not want to give to Globe for the reasons already discussed.

Indeed, a case very similar to mine is *Baker v. Ratzlaff*, 1 Kan.App.2d 285, 564 P.2d 153 (1977). In this case, the seller of popcorn agreed with the buyer/distributor for payment upon delivery of each of several shipments or the seller could terminate the contract. On the first two occasions when the seller delivered the popcorn seller made no demand for payment and buyer offered none. Buyer established at trial that the practice was to pay after processing the weight tickets at another location. The seller gave a written termination letter for failure to pay upon delivery. The court held the seller violated the duty of good

faith and fair dealing because the seller was using the nonpayment as a "technical pretense" to terminate; the real reason was that the seller could sell the popcorn at a substantially higher price to another buyer. This is similar to my case because Coors used certain grounds to terminate Globe that were mere pretext for other reasons.

Considering the foregoing, I conclude that Globe has established a valid cause of action for breach of Coors' duty of good and fair dealing.

### C. Waiver

■ To establish waiver, Coors would have to prove the "voluntary or intentional abandonment or relinquishment of a known right" *Therrien v. Maryland Casualty Co.*, 97 N.H. 180, 181, 84 A.2d 179 (1951). See also *Logic Assoc., Inc. v. Time Share Corp.*, 124 N.H. 565, 571, 474 A.2d 1006 (1984). I do not believe Coors has met this test because Globe did not voluntarily and unconditionally accept the termination, or relinquish its right to sue for wrongful termination.

Globe's actions in agreeing to the sale were not voluntarily. Coors had terminated the distributorship with no notice and sent a delinquency letter to the Liquor Commission thereby shutting down Globe's business. The Globe representatives discussed the option of suing when they caucused separately on October 18th, but they didn't have the legal documents or time to decide if they could sue, so they proceeded to try to agree to a sale. Coors' plan worked. Although Globe agreed on a price it was happy with, this doesn't vitiate the coercion since selling the entire business was not Globe's first choice of options in solving its financial problems.

■ The more important reason Coors cannot prevail on a waiver theory, however, is that Globe never relinquished its right to sue. Globe and Coors always understood that the sale was one way to resolve the parties' differences over the

termination and both hoped it would work. In a realistic sense the entire sale agreement *with its condition subsequent regarding Liquor Commission approval* was really just a settlement agreement between the parties to avoid litigation over the termination if the sale could go through.[17] Indeed, there was a mutual release that was held in escrow pending Liquor Commission approval of the deal. The release never became effective since the deal fell through. Then, Globe timely asserted its rights.

Coors also raised the issue of estoppel. I see no possible way to apply this doctrine here since Coors always knew the sale was the way to prevent litigation, and once the sale failed they fully expected to be sued for wrongful termination.

### D. Duty of Good Faith Re Effectuating Sale Transaction

■ Globe also contends that Coors violated the covenant of good faith and fair dealing by not agreeing to a sale with a possible third-party purchaser or agreeing to a drop-dead date for financing. Globe cites the case of *Seaward Constr. Co., Inc. v. City of Rochester*, 118 N.H. 128, 383 A.2d 707 (1978). In that case, a contractor had an agreement with a municipality that the contractor would install pipe, but would only be paid from federal funds if the municipality received those funds. The court implied a covenant that the municipality had to make a good faith effort to get the federal funds.

*Seaward* is inapposite. Although my case is like *Seaward* in that there was discretion given to Coors to act for the benefit of Globe, *Seaward* is unlike this case because Globe was not solely relying on the sale to be given a remedy for the termination. See generally *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187 (1989). In other words, Globe knew that it still had the right to sue if the sale did not go through.

Of course, there is also a duty of good faith on the part of Coors to attempt to

---

**17.** Coors had reason to know prior to the October 18th meeting that New Hampshire regulators took a very dim view of any extended brewer involvement in the financial affairs of distributors within the State.

complete the sale as agreed to by the parties. But this Coors did. Coors worked hard to complete the sale, and everyone, even Globe, was surprised at the Liquor Commission's disapproval after the preliminary work done to the satisfaction of the Attorney General's representative. The fact that Coors did not execute a further deal is unimportant because the duty of good faith only bound Coors "to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting", *Centronics Corp., supra,* at 143, 562 A.2d 187, and the parties' purpose was to put together a deal *acceptable to both sides* that would avoid litigation.

The simple fact is that the sale agreement negotiated between the parties after the October 18, 1988 meeting did not obligate Coors to guarantee that the sale transaction would go through or that Coors would cover Globe's exposure with a terminated distributorship in the event Coors was not obligated to release the $5.3 million dollars in escrow. It is for that very reason, i.e., lack of any consideration received or conduct of estoppel, that Globe has been able to successfully argue that it did not waive or become estopped from asserting its claim for wrongful termination of its distributorship once the sales transaction fell through. Globe cannot have it both ways.

Accordingly, I conclude that Globe has failed to establish a valid cause of action for damages due to any breach of duty by Coors to complete the sales transaction.

## DAMAGES

### I. *Contract and Statute*

■ NH RSA 181:41(III) states that the prevailing party "shall be entitled to actual damages, including reasonable attorneys' fees and also including the value of the wholesaler's business as specified in RSA 181:40, I." The latter section states:

> Any certificate of approval holder which amends, cancels, terminates, or refuses to continue or renew any agreement; requests a wholesaler to resign from an agreement, without good cause shown, as used in RSA 181:38; or unreasonably withholds consent to any assignment, transfer or sale of a wholesaler's business, shall pay the wholesaler reasonable compensation for the value of the wholesaler's business lost due to the terminated brand or label. The value of the wholesaler's business shall include inventory and other tangible assets and its good will, if any.

Globe's actual damages, as defined in RSA 181:41(III), is $5,166,118.00 This was the value of Globe on October 18, 1988 according to the credible testimony of accountant Norman Beauchesne. This value is also corroborated by Coors' own expert, Scott Whitley, and indeed the fact that Coors agreed to a $5.3 million dollar sales price at the conclusion of the October 18, 1988 meeting. The value of Globe is the proper measure of damages for the contractual breach as well as the statutory violation. Cf. *Lahey v. Shaw,* 123 N.H. 648, 466 A.2d 911 (1983). Globe is also entitled to its attorneys fees under the statute.

The damages under RSA 181:40(I) are subsumed in the provision for "actual damages" in RSA 181:41(III) and thus it is technically unnecessary for this Court to address Globe's alternative argument to the effect that it would be entitled to damages for termination of the distributorship under RSA 180:40(I) even if Coors had established that it had good cause for the termination and that accordingly Globe's sole remedy would lie under RSA 181:40(I).[18]

---

**18.** The parties dispute is whether good cause must be shown to get damages to the value of the wholesaler's business lost due to the terminated brand or label. Under RSA 181:40(I) in view of the semi-colon punctuation around the clause—"request the wholesaler to resign from an agreement, without good cause shown, as used in RSA 181:38"—Globe argues that that punctuation indicates by normal statutory and grammatical interpretation that the prior language with regard to liability for cancelling or terminating a distributorship agreement is *not* limited by a "without good cause shown" proviso. On first blush, it would appear that such construction would lead to an absurd result justifying ignoring of the punctuation, see *In re*

## II. *Good Faith and Fair Dealing*

■ Globe is entitled to $5,166,188.00 as damages for the value of its distributorship under its theory of breach of the implied covenant of good faith and fair dealing. Cf. *Martin v. Phillips*, 122 N.H. 34, 440 A.2d 1124 (1982). However, since this cause of action was designed to put the nonbreaching party in the same position as he would have been in if no breach had occurred these damages cannot be in addition to the remedy for violation of the agreement/statute. This is merely a supplemental cause of action for damage award purposes.

## III. *The New Hampshire Consumer Protection Act*

■ This statute prohibits any person from using "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." NH RSA 358–A:2. The statute provides a nonexclusive list of examples, but Globe does not contend any of them are implicated here. NH RSA 358–A:10 provides that if a person commits a "willful or knowing violation of this chapter [the court] shall award as much as 3 times, but not less than 2 times, such amount." In addition, the prevailing party can be awarded the costs of suit and reasonable attorney's fees.

The main case Globe relies upon is *Pepsi–Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir.1985), involving the extorted sale of goods, which is not factually similar except that the defendants acted willfully. There is one case that suggests that the termination of a business implicates this statute. In *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 408 N.E.2d 1370 (1980), the Massachusetts Supreme Judicial Court held that the termination of a franchisee by a franchisor did not implicate the consumer protection statute on the facts in that case. The contract there provided for termination without cause upon 90 days notice, which the franchisee knew and understood. The franchisee there had not built up any goodwill nor did it have any substantial investment in the enterprise.

In my case, Globe had substantial goodwill and had enlarged its business significantly due to its own efforts. Globe also spent considerable funds to accommodate Coors' refrigeration requirements. While Globe and Vitale had substantial financial problems at the time of the termination, it is also clear from this record that the enterprise nevertheless had a going concern value of not less than $5,166,188.00 at the time that the distributorship was terminated and that that investment was forfeited by Coors' actions. Moreover, I believe that Coors was in fact guilty of willful and knowing "unfair or deceptive act or practice" in the manner by which it engineered the termination and sale transaction relating to the Globe distributorship. Accordingly, Globe is justified in seeking the doubling or trebling of its actual damages in accordance with this statute, together with an award of costs and attorney's fees.

Whether the damages should be doubled or trebled is problematical since the statute authorizes a choice in that regard in the discretion of the Court but provides no standard for the exercise of that discretion. In the absence of any other guideline, I believe a reasonable application of the statute would let the choice between doubling and trebling the damages depend upon the egregiousness of the defendant's conduct and degree of willful and knowing conduct in the circumstances. This in turn would

*PSNH*, 108 B.R. 854, 875–6 (D.N.H.1989), since otherwise a brewer under this statutory provision would have to pay for any termination even though justified. However, on second blush, it is difficult to understand why the legislature would adopt that specific semi-colon punctuation when the statutes in other states upon which this provision was modeled do not include that type of punctuation. It may be that the deft hand of a lobbyist can be discerned and

there was testimony at trial to the effect that the wholesale distributors association was exerting every effort at the time of the passage of the statute in question to have as broad protection for distributors against suppliers as possible. Inasmuch as the issue is not necessary for my decision, and considering the ramifications for state law by any such decision in a case that does not require the same, I decline to reach that issue here.

indicate that the Court should consider any extenuating circumstances from the standpoint of the defendant. In the present case, Coors did have legitimate concerns regarding the future viability of Globe which, while they did not justify termination without notice, did raise questions at least in Coors' mind as to whether the distributorship could continue to properly market its product in the area. It also appears that Coors did believe that the sales transaction could get through the Liquor Commission and devoted considerable effort in that regard.[19] On the other hand, Coors' conduct in taking deliberate action to preclude Globe from working out its viability problems within a reasonable time frame with some advance notice of termination in the event the effort was not successful, and particularly to preclude Globe from availing itself from the rehabilitative remedies available under reorganization of the Bankruptcy Code, is conduct which should not go unsanctioned.[20] The New Hampshire statute under consideration is available for that purpose in my judgment.

Considering all of the foregoing, I conclude that Globe has established a valid cause of action for violation of the New Hampshire Consumer Protection Act, and that doubling of actual damages in this case is appropriate under that statute, together with award of costs and attorney's fees.

## COUNTERCLAIM

Coors has a valid claim for $160,000 in past due beer debt, plus an additional $44,000 that went unpaid on October 18, 1988.

Coors is also owed $85,000, which is the value of 12,000 cases of Coors beer which Globe sold after December 12, 1988 without payment when the sales transaction fell through.

## CONCLUSION

The Adolph Coors Company wrongfully terminated Globe on October 18, 1988 because Coors had no contractual or statutory basis to do so without making a proper demand, and because Coors' conduct violated the covenant of good faith and fair dealing. Globe has no cause of action against Coors concerning the failure of the sale transaction. Globe is entitled to an actual damage award of $5,166,188.00, to be doubled pursuant to NH RSA 358–A:10, together with an allowance of reasonable attorney's fees and costs. A separate final judgment to that effect shall be entered.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.[21]

## FINAL JUDGMENT

For the reasons stated in the memorandum opinion filed contemporaneously this date, it is hereby ordered

1. Defendant shall pay plaintiff the sum of $10,043,376.00 plus interest from October 18, 1988.

2. Plaintiff is entitled to costs and reasonable attorneys' fees. Plaintiff shall file an itemized statement of costs and fees

19. There is nothing in this record to indicate that Coors deliberately "set up" Globe in a sham sales transaction that it knew could not get through the Liquor Commission, nor did it seek to simply terminate Coors in a fashion that it knew at the time of termination would result in it appropriating to itself without compensation to Globe the network and goodwill values that Globe had built into the distributorship. Had either of those factors been established a trebling of damages clearly would have been indicated.

20. The rehabilitative remedies available under the Bankruptcy Code were not available only for the equity holders in Globe but for the creditor constituencies created by the ultimate close down of the debtor's operation by virtue of Coors' wrongful and deceptive acts and the termination action it took against Globe. There are filed proofs of claim in this estate in the amount of $30,607.46 of priority wage claims, and $1,003,791.93 in general unsecured claims.

21. The parties prior to trial stipulated on certain agreed facts which are hereby incorporated by reference to the extent they are not already covered in the foregoing findings set forth in this opinion. The additional request for findings and conclusions submitted by each party are denied except to the extent that they are incorporated in the findings and conclusions set forth in this opinion.

with this Court in thirty days, and a hearing will be scheduled shortly thereafter.

DONE and ORDERED.