**In re SILVER BROTHERS COMPANY, INC., Debtor.**

**Bankruptcy No. 88–395–JEY.**

United States Bankruptcy Court, D. New Hampshire.

March 17, 1995.

Victor Dahar, Chapter 7 Trustee, Manchester, NH.

Jon Schneider, Goodwin, Proctor & Hoar, Boston, MA, for debtor.

Lawrence M. Edelman, M. Elaine Beauchesne, Sanders and McDermott, Hampton, NH, for Miller Brewing Co.

William S. Gannon, Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, NH, for Frances Murray.

James E. McGuire, Brown, Rudnick, Freed & Boston, Boston, MA, for Stewart F. Grossman.

Neil D. Warrenbrand, Looney & Grossman, Boston, MA, for Murray Creditor Trust.

Geraldine Karonis, Manchester, NH, for U.S. Trustee.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

### TABLE OF CONTENTS

| | Page No. |
|---|---|
| Introduction | 989 |
| Procedural Context | 989 – 1004 |
| Phase I | 989 – 998 |
| Phase II | 999 |
| Phase III | 999 – 1000 |
| Phase IV | 1000 – 1003 |
| Phase V | 1003 – 1004 |
| Findings of Fact | 1004 – 1006 |
| Relevant Case Law | 1006 – 1009 |
| Conclusion | 1009 – 1012 |

### INTRODUCTION

This case is before the Court for decision following a two-day evidentiary hearing held on a motion to vacate an Order of this Court dated July 12, 1990. The July 1990 Order addressed conditions of assignment of a counterclaim in a pre-bankruptcy lawsuit between the debtor and Miller Brewing Company to Frances G. Murray, the wife of David Murray, the debtor's principal officer and stockholder.[1] This Court actually vacated the July 1990 Order by Order dated December 8, 1992 but the 1992 Order was appealed by Frances G. Murray.

On January 24, 1994 the District Court entered an Order regarding the appeal which (1) Reversed the December 8, 1992 Order due to certain procedural irregularities involved in the entry of that Order resulting in a reinstatement of the July 1990 Order; (2) Remanded the case to this Court to determine on a proper evidentiary record whether the July 1990 Order should or should not be vacated; and (3) Affirmed this Court's Order dated May 26, 1993 which provided for further procedures to sell, settle, or litigate the counterclaim in question. The effect of the District Court's action was to delay any implementation of the May 1993 Order until on remand this Court determined whether the July 1990 Order would be vacated.

The matter is unusually complicated by virtue of this procedural history and accordingly it will be useful to set out in some detail the matters of record that have established the procedural context for this decision before getting into the findings and conclusions resulting from the evidentiary trial.

### PROCEDURAL CONTEXT

#### Phase I

This case was filed under Chapter 11 of the Bankruptcy Code on June 23, 1988 and converted to a Chapter 7 case on March 17, 1989. Among the bankrupt estate's assets were counterclaims by Silver Brothers Company, Inc. ("Silver Brothers") against Miller Brewing Company ("Miller"), which have been asserted in pending litigation in the United States District Court for the District of New Hampshire ("District Court") entitled *Miller Brewing Company v. Silver Bros. Co., Inc., Hospitality Holdings Corp., and Stewart F. Grossman, Trustee of the Murray Creditors' Trust,* Civil Docket No. 88–CV–229–B. The law suit (filed June 9, 1988) was commenced and the counterclaims (filed June

---

1. This case has the somewhat bizarre situation of a defendant in a civil lawsuit arguing that the purported assignee of a counterclaim against itself in a pending lawsuit (who received assignment of the counterclaim from a trustee in bankruptcy) did not do enough to aggressively pursue the lawsuit against itself. Miller Brewing has conceded that the only relief they seek is to have the sale Order vacated. This would permit the trustee to again pursue the counterclaim.

14, 1988) were asserted prior to the filing of this bankruptcy case.

On June 1, 1990, the Chapter 7 Trustee filed a "Notice of Intent to Assign Pending Law Suit" (Court Doc. No. 222), in which the Trustee indicated an intent to assign all interests in the lawsuit, including both the case in chief and the counterclaims, to Frances R. Murray for $3,000.00.[2] The Trustee stated that he "does not feel that pursuing the counterclaim will result in any funds that would be available to unsecured creditors.... [and] that the cost of litigation would exceed any recovery....".

An Objection to the assignment was filed by Miller (Court Doc. No. 223), and the matter came on for hearing before visiting Bankruptcy Judge Goodman· on July 10, 1990, at which time Miller made an offer of $10,000 for the assignment of the lawsuit. Judge Goodman continued the matter for bidding to the highest bidder on July 11, 1990, and the successful bidder was Frances Murray, with a bid of $15,000.00 together with certain additional undertakings. The Court on the Trustee's recommendation rejected a higher $20,000 cash bid by Miller Brewing Company. On July 12, 1990, Judge Goodman held a further hearing at which the terms of the offer and approval were clarified. Following this hearing, the Trustee revised and re-submitted a proposed order of approval which was entered later that date.

The Order dated July 12, 1990 (Court Doc. No. 227), begins with a recital of the procedural history of the various offers for assignment of the counterclaim and notes "the record of the hearing reflects the bidding process that took place" and that "the successful bidder was Frances R. Murray" and then in the *decretal* portion of the Order provides as follows: .

It is ORDERED, ADJUDGED and DECREED as follows:

1. Frances R. Murray will pay over forthwith to Trustee Victor W. Dahar the sum of $15,000.00 which will be paid to the estate and will be property of the estate.

2. Frances R. Murray will immediately retain legal counsel to pursue the litigation in the U.S. District Court in the Miller case at her sole expense on behalf and in the name of the Trustee in Bankruptcy for Silver Brothers Co., Inc.

3. From any recovery realized in the pending litigation, the Trustee in Bankruptcy will receive the first $100,000.00 of any recovery before payment of any attorneys fees and the balance of any recovery will become the property of Frances R. Murray.

4. Frances R. Murray will have a period of six (6) months to pursue this matter and must pursue it diligently and periodically report to the Trustee in Bankruptcy the progress being made with the litigation.

It will be noted that the decretal portion of this Order does not explicitly approve an assignment of the counterclaims to Frances R. Murray.

The hearings that resulted in the July 1990 Order show in their transcripts that the proposal before Judge Goodman was constantly shifting and Mr. Williams acting for Frances Murray was constantly "negotiating" with the Court as to what type of offer would be acceptable. The hearings over the three-day period, July 10, 11, and 12, 1990, are all covered by one transcript (Transcript docketed December 10, 1991). The foregoing development and final action is reflected in the following pertinent extracts from the transcript:

### (July 10, 1990)

THE COURT: Silver Brothers, Inc., Chapter 7. This is a hearing on Notice of Intent to Assign a Pending Lawsuit in the U.S. District Court. Are the parties here on this matter?

MS. BEAUCHESNE: Good afternoon, Your Honor. Elaine Beauchesne and Larry Edelmen for Miller Brewing Company.

---

2. Frances R. Murray is the wife of David W. Murray. David W. Murray is one of two Directors of Silver Brothers Company, Inc., is Chairman and President of Silver Brothers Company, Inc., and is the President and sole shareholder of Hospitality Holdings Corp., which is the sole shareholder of Silver Brothers Company, Inc. David Murray himself is an individual debtor in a pending case in the Bankruptcy Court for the District of Massachusetts.

THE COURT: Uh-huh.

MR. DAHAR: Victor, Dahar, Trustee in bankruptcy, Your Honor for Silver Brothers.

THE COURT: I've read the pleadings in this case. Can we read between the lines? Miller Brewing Company doesn't want this assigned because they feel if the Trustee doesn't bring the action, they can get rid of it. Isn't that the truth?

MS. BEAUCHESNE: Well, Your Honor, we don't believe that the counterclaim against us has any merit, of course.

\* \* \* \* \* \*

MR. DAHAR: Well, let me—I've got some facts I want to present to the Court, Your Honor. The—I've been offered three thousand dollars to sell the assignment to Mrs. Murray.

THE COURT: And now [Miller wants] to buy the claim for ten thousand?

MR. DAHAR: No. They offered me six thousand dollars, Your Honor; and I relayed that information to the attorney for Mrs. Murray; and I met with him this morning; and he couldn't reach his clients. I have a letter that he drafted and handed me. He says he wants this held over for seven more days so that he can outbid them. In the meantime—

THE COURT: Well, that's fine. That's fine.

MR. DAHAR: Let me just fin—in the meantime, Your Honor, [Miller has] now offered me ten thousand dollars; but they say the offer's only good today, not tomorrow.

\* \* \* \* \* \*

THE COURT: Will your offer stay open until tomorrow at two?

MR. EDELMEN: We'll have to check with our client.

THE COURT: Well, you let me know in the next ten minutes. If so, I will order that both parties continue this matter till tomorrow afternoon at two; and this Court will hold a bidding right here in the courtroom then and settle the matter once and for all.

MR. DAHAR: That's it. That's good. All right.

\* \* \* \* \* \*

(Transcript, July 10, 1990, at pp. 2–5)

**(July 11, 1990)**

\* \* \* \* \* \*

THE COURT: Well, let's start the bidding at the current offer of ten thousand dollars; but an upset bid will be any bid that increases it by not less than ten percent. Is that fair?

MR. WILLIAMS: Your Honor, before any bidding—

MR. DAHAR: You're still at ten thousand.

MR. WILLIAMS: May I make a statement to the Court?

THE COURT: Please.

MR. WILLIAMS: Your Honor, this case— just a brief history, this case emanates out of the original lawsuit brought by Miller Brewing Company against Silver Brothers to terminate a beer distributorship contract.

THE COURT: I understand. Sure.

MR. WILLIAMS: There was a counterclaim, and we're talking about the counterclaim.

THE COURT: I understand. Right.

MR. WILLIAMS: I don't know what the value of the counterclaim—I don't whether it has merit or it doesn't have merit. All I mean to say that if it has merit, it's worth a lot of money.

THE COURT: Right.

MR. WILLIAMS: The bid that Miller has made for ten thousand dollars is basically kind of a cost-of-defense bid on their part.

THE COURT: Right.

MR. WILLIAMS: Mrs. Murray has bid three thousand dollars. We've also offered the Trustee, Attorney Dahar here, that if we have the chance to purchase it for three thousand dollars, Mrs. Murray will incur all the costs of litigation to get through the discovery stage and find out what kind of case we have here; and then if there's an ultimate recovery, I've offered in writing to Attorney Dahar

that he will receive the first hundred thousand dollars of any recovery. The—it goes to the adequacy of the bid by Miller. They're bidding ten thousand dollars. What is the fair value of this claim? I have no idea. I don't think anybody does. Attorney Dahar doesn't think much of the claim. But I don't think we know and we won't know. My proposal is that the Court please consider a six-month period to allow Mrs. Murray to retain a law firm, do the investigation, and find out discovery and find out what this thing is worth; and if it is worth pursuing, ultimately the creditors may recover another hundred thousand dollars. Right now as far as open bidding to this claim, Mrs. Murray cannot compete with the resources of Miller Brewing Company. She just can't. She's made a nominal bid to take it off the hands of Attorney Dahar in order to spend—

THE COURT: Well, how can you suggest to this Court that she couldn't compete with the ten thousand dollar bid of the brewing company but, at the same time, suggest that she could, however, foot the bill of all the legal expenses of discovery, et cetera to determine whether or not the claim is valuable?

MR. WILLIAMS: Well, what I mean to say is she can't do both. She can't outbid Miller and then incur the cost of litigation. I mean I suppose if we bid eleven thousand, Miller, I'm sure with their resources, is willing to go much higher maybe; and at some point it's a law of diminishing returns. You know, we can't outbid ourselves and then fund the litigation, also. I—

(Transcript, July 11, 1990, at pp. 7–9)

\* \* \* \* \* \*

MR. DAHAR: Miller brought an action in the federal court against Silver Brothers, and they asked for temporary restraining orders and what have you, and there was a hearing, and they'll verify this. Judge Devine would have to find that the corporation was willful in order to find against them, and temporarily he did find that their operation was willful violation of the Miller contract and ruled against Silver Brothers. Now the case is coming up for a permanent hearing; and the same issue exists; but in the meantime Silver Brothers, before I got involved, brought a counterclaim alleging damages against Miller for doing those things that they did. So its a typical contract—breach of contract with a counterclaim saying you breached the contract. So it's a contest. God only knows what it's worth. I don't think—I don't have that much confidence in it; and from what I can see, it's going to cost too much to get involved; and the federal judge up in—they've been pressing me to come forward and start defending this thing for the last six months. That's why I've made this move because I didn't want to defend it, and I didn't have the funds to go forward.

THE COURT: How much funds do you have in the estate now, sir?

MR. DAHAR: There's about three hundred twenty or $333,000.00, Your Honor; but most of that is all allocated either for administrative expenses or for legal fees or some type of secured claims. I haven't sorted them all out. So it's not going to be a pool of money that's going to go to the unsecured creditors or something that I could just tap arbitrarily for the defense.

THE COURT: Sir?

MR. EDELMEN: If I could just clarify one point. It was—the case essentially started in May of 1988 when there appeared to be no Miller beer on the shelves in the state of New Hampshire. Miller terminated Silver Brothers. Miller sued Silver Brothers for a breach of the distributorship agreement. Silver Brothers counterclaimed for wrongful termination.

THE COURT: You mean to tell me that the fact that there was no Miller's beer on the shelves in New Hampshire wasn't due to the sales being made so fast that you couldn't keep it on the shelves, uh?

MR. EDELMEN: Exactly, Your Honor.

THE COURT: Okay.

MR. EDELMEN: And there—

THE COURT: Well, you didn't say that. You just said there weren't any—

MR. EDELMEN: Well, there was a trial—

THE COURT: You want to assume something different here?

MR. EDELMEN: No. You should not assume anything different, Your Honor.

THE COURT: Right.

MR. EDELMEN: There was a trial, however on a request for a preliminary injunction. The temporary restraining order on the counterclaim was denied. Silver Brothers had a request for a preliminary injunction. There was a four-day trial before Judge Devine after which Judge Devine ruled that Silver Brothers had willfully breached the distributorship agreement. I just wanted to clarify what was—

THE COURT: Did anybody else wish to be heard?

MR. WILLIAMS: Just one more word, Your Honor. I don't know—I don't see what the urgency of selling or assigning this claim—

THE COURT: There isn't any urgency. I'm willing to rule in your favor. Put up a ten thousand dollar cash bond so that they can be guaranteed that if six months goes by and nothing is benefitted by it, except that they lose the sale to these people, that they'll have the same ten thousand dollars; and I'll rule in your favor.

MR. WILLIAMS: Give me seven days to put up the bond, Your Honor.

THE COURT: No. Their deal goes through today, or they'll withdraw it. I'll give you any period of time to put up the bond that'll guarantee this debtor's estate not to have any losses as a result of delaying this case more than one minute after I leave this courtroom today.

MR. WILLIAMS: If I understand correctly, you'll give me a few days to post the bond?

THE COURT: No. I said I will give you—

MR. WILLIAMS: I can't post the bond today, Your Honor. I don't—I can't even contact my client.

THE COURT: Well, the point of the matter is that they have an agreement to sell this claim to these people here today for ten thousand dollars.

MR. WILLIAMS: I understand.

THE COURT: And if they don't, the position of the Trustee is that "I lose ten thousand dollars." And if there's no way to absolutely guarantee this debtor's estate that it will not lose this ten thousand dollars; i.e. the urgency that you say not to continue this matter for ten more weeks or six months or whatever. That is what the urgency is. And if you believe this claim's worth so much more and you're willing to guarantee that there'll be no loss or diminution to this debtor's estate by posting the ten thousand dollar cash, this Court will consider it. Otherwise it can't.

\* \* \* \* \* \*

(Transcript, July 11, 1990, at pp. 16–20)

\* \* \* \* \* \*

MR. WILLIAMS: Your Honor, we will post the bond. I've given Mr. Dahar my representation that as long as it takes me to walk to my office and back to his, which is a total of three hundred yards, he'll have a check for an additional seven thousand dollars. As I understand, we'll have months to pursue this claim and report to the Court and Mr. Dahar as to the progress. If there's no appreciable progress, then we forfeit the ten thousand dollars. Is that my understanding of the Court's order?

THE COURT: No. No. No. My understanding is that the minimum this estate will get from your client will be ten thousand dollars; and in addition, you will pledge to carry this case forward, pay all the expenses, and the debtor's estate will get, as a minimum, the first one hundred thousand dollars of any recovery. Isn't that your position?

MR. DAHAR: That's right, Your Honor, yes, exactly.

MR. WILLIAMS: That's right.

THE COURT: Yeah. What is your position, Mr.—

MR. DAHAR: That's right. And if the case is unsuccessful, I still keep the ten thousand dollars.

THE COURT: That's right.

MR. WILLIAMS: And we have paid whatever we paid for legal fees, and that's the end of that. I understand that.

MR. DAHAR: That's my understanding.

THE COURT: Is that agreeable to you?

MR. WILLIAMS: Yeah.

\* \* \* \* \* \*

(Transcript, July 11, 1990, at pp. 22–23)

\* \* \* \* \* \*

MR. WILLIAMS: I mean—well, Miller bids whatever they bid and that's the end of it. I bid whatever I bid and then, from what I've heard from Boston attorneys who have reviewed this case and kind of tentatively agreed to take it, it's going to take like fifty to a hundred thousand dollars to pursue this thing. So I'm bidding—

THE COURT: On top of that.

MR. WILLIAMS: —on top of that—

THE COURT: I understand.

MR. WILLIAMS: —and all they have to do is go up a thousand bucks, but the key to this thing is no one in this courtroom knows the value of that claim.

THE COURT: Well, but nobody ever knows the value of a claim really.

MR. WILLIAMS: Exactly. And that's why—

THE COURT: You have to understand where it is you're going to go. How is the—what is the Trustee's position?

MR. DAHAR: Well, I would think I'd take the position, Your Honor, we're talking 110,000 at this point because if I've got ten thousand in the till anyway that I can't lose and I have a prospect of a hundred thousand, if they're successful, I think I'm talking probably 110,000 at this point.

THE COURT: Well, okay, now—and you—do you feel that you'd rather accept that bid rather—

MR. DAHAR: I think at this point I would accept the ten in cash and the potential hundred thousand provided they do the defense work as they said they're going to do. I'm satisfied with that unless they come with—in other words, if they come with another thousand dollars, I don't think that's going to entice me to want to go for eleven thousand. I want to see some big money if—right now I'm talking $110,000.00 at this point. Ten cash and the promise of a hundred thousand of the recovery if they do a good job with their defense, and apparently they've already talked to some attorneys who are going to handle this thing. So, on that basis, I think I'm prepared to go with the—with Mrs. Murray's offer here.

MS. BEAUCHESNE: I guess I would say at this point, Your Honor, we're prepared to bid higher. We're also prepared to make our argument that a sale to Mrs. Murray is improper in any event as we originally objected in the alternative to—

THE COURT: Well, I'm going to overrule that. I'm going to overrule it. You can use that as a defense in the litigation later, if you wish to do so.

MS. BEAUCHESNE: I'm not sure I understand the Court.

THE COURT: Well, let's assume you're right that it's improper to assign it—

MS. BEAUCHESNE: To Mrs. Murray.

THE COURT: —to Mrs. Murray. Who has to bear the burden of that? Mrs. Murray, right?

THE COURT: If he sells this claim to Mrs. Murray or am I to understand that the claim will be continued in the name of the debtor's estate or in the name of Mrs. Murray?

MR. WILLIAMS: I understand it will be in the name of the Trustee.

THE COURT: Okay.

MS. BEAUCHESNE: I don't believe that was the proposal, Your Honor.

THE COURT: Do you think it's improper to take such a proposal at this date?

MS. BEAUCHESNE: I believe it is improper, Your Honor, to sell the claim to Mrs. Murray under, if nothing else, the local

administrative order number ten of this Court.

THE COURT: Which says what?

MS. BEAUCHESNE: Which prohibits sales to—which prohibits the—or describes the parties who are not able to purchase assets from a bankruptcy estate, which we believe includes the wife of the sole shareholder of the debtor.

THE COURT: Does that prohibit a debtor's estate to, for a sum certain, agree that they will carry forward a claim on behalf of the debtor's estate and pay the expenses and share the benefits?

MS. BEAUCHESNE: I guess not, Your Honor; but I guess I would also say that we have no certainty that this potentially fifty to hundred thousand dollars in litigation expenses plus a hundred thousand to the Trustee or to the creditors of this estate is—that's secured by a ten thousand dollar check. That's a very inadequate security.

THE COURT: No. I don't think—no. That isn't what that was—it wasn't security for. It was a guarantee that they wouldn't receive less than what they had received from you.

MS. BEAUCHESNE: And—well, I guess what I'm saying, Your Honor, is that—

THE COURT: That is no guarantee because you're prepared to bid more.

MS. BEAUCHESNE: That's right.

THE COURT: And at this point in time the Court will add one more ten-minute recess, and the rules will be as follows then: The parties will submit a sealed bid to the Court indicating the highest amount of money that each party would be willing to pay for this claim with the understanding that the only upset bid will be in the event that Mrs. Murray agrees that she will supply to the debtor's estate that sum of money in addition to, in addition to the guarantee that she will carry forward all the legal expenses on behalf of the debtor's estate in pursuit of that claim and that the debtor's estate will get one hundred thousand

dollars in addition to that bid. Is that fair enough?

\* \* \* \* \* \*

(Transcript, July 11, 1990, at pp. 25–29)

\* \* \* \* \* \*

MS. BEAUCHESNE: If the Court could reiterate the terms? I've gotten a little confused.

THE COURT: I'm only saying that an upset bid—your bid, in order to prevail over his bid, will have to exceed his bid by ten thousand dollars because the Trustee believes that the offer of all litigation costs and the first one hundred thousand dollars out of the litigation is worth at least ten thousand dollars cash to the estate now.

\* \* \* \* \* \*

THE COURT: Okay. Then the parties will go into the clerk's office and obtain a sheet of paper and an envelope and shall write in it the amount of the cash bid. That bid will be binding on the party that the Court awards the bid to. The understanding is is that the bid of the brewing company shall exceed the counterbid by at least ten thousand dollars, and we will start from that point. Court will be in recess until three o'clock.

\* \* \* \* \* \*

THE COURT: So your only question is whether or not this—your only question in asking is you don't want the sale or the agreement—in your case, it's a sale. In his case, the debtor's going to be guaranteed that sum of money; and it won't be a sale. It'll be going forward in the debtor's name with the other party guaranteeing that they will pay all the legal expenses and the first hundred thousand.

\* \* \* \* \* \*

(Transcript, July 11, 1990, at pp. 33–35)

\* \* \* \* \* \*

MR. EDELMEN: Your Honor, we have a sealed bid.

MR. WILLIAMS: We have a sealed bid.

THE COURT: Please submit them to the Court, and I'll open them now in open

court. (Pause while opening bids) The bid of Frances Murray is fifteen thousand dollars plus the promise—promises as made. The bid of Miller Brewing Company is twenty thousand dollars. So the Trustee, based upon its representations to the Court then, may proceed with the agreement with Frances Murray on representations by the attorney, Joseph Williams, that he has in his possession and will turn over to this debtor's estate fifteen thousand dollars in cash today and the further promise that the debtor will proceed on this litigation in the name of the debtor's estate with all of the expenses of the litigation to be paid by Frances Murray, based on the representations made by her counsel, Joseph Williams, and, further, that the first one hundred thousand dollars of that litigation, if the debtor's estate prevails, will be paid over to the debtor's estate. Is that your understanding?

MR. DAHAR: It's my understanding, Your Honor.

THE COURT: What about the remaining portions of the litigation, it there are any—

MR. DAHAR: Well, the way that we've been discussing it, whatever—anything in excess of one hundred thousand, I guess, would belong to Mrs. Murray, Your Honor.

THE COURT: Okay. Okay, fine. And you're—that's agreeable to you?

MR. WILLIAMS: That's agreeable to me, Your Honor.

THE COURT: Okay. The Court will allow it. You will supply the Court with a form of order.

 * * * * * *

(Transcript, July 11, 1990, at pp. 41–42)

### (July 12, 1990)

THE COURT: Now let me get out of the way the Sliver Brothers case.

MR. DAHAR: I prepared a proposed order that I'll give, if you want to discuss it. I've prepared a proposed order as discussed yesterday, Your Honor.

THE COURT: Yeah. No order's been entered?

MR. DAHAR: Well, you instructed me to prepare the order yesterday—

THE COURT: Right.

MR. DAHAR: —which I've done. There's some confusion over a certain aspect of the order.

(Long pause)

THE COURT: Okay. Now who is it that has a problem with this order?

MR. DAHAR: I think Mr. Williams has suggested something I don't think we discussed.

THE COURT: Mr. Williams?

MR. WILLIAMS: I don't have a problem with the order, Your Honor. I have a problem with the interpretation that Mr. Dahar and, I think, Miller is placing upon it. My letter to Attorney Dahar upon which we set the bidding process and everything indicated—and I quote from the letter. It's just a short—

"In my conversation this morning, I stated that if Mrs. Murray's offer of three thousand were accepted, she would commit to paying all costs of litigation and should she receive and collect a judgment against Miller, you, as Trustee, would be entitled to the first hundred thousand dollars of any recovery after deduction for cost of litigation."

THE COURT: I didn't perceive that that was the way this rule went, and I'm going to tell you the reason why. It's quite possible that the cost of litigation could exceed a hundred thousand dollars and the estate would get nothing. That was not what was intended by yesterday's bidding, and I understood it to be that you were to pay fifteen thousand to the debtor's estate. That they were to have in any event. In addition, you obligated your client to expend whatever sums were necessary to bring the litigation to court. Three, that when that litigation was concluded, they would get the first hundred thousand dollars worth of cash received from that litigation;

and thereafter, the balance of those funds would go to your client.

\* \* \* \* \* \*

MR. DAHAR: Well, what he's saying now and what we discussed this morning, he said if the judgment was a hundred thousand dollars—

THE COURT: Let's assume that they spend two hundred thousand dollars and that the judgment is fifty.

MR. DAHAR: I'd get zero at that point then.

THE COURT: No. No.

MR. DAHAR: That's his interpretation.

THE COURT: Well, that's what he says; but that isn't what was pointed—that was not what was represented to this Court. What was represented to this Court is is that they would pay all the expense of litigation and that the first one hundred thousand dollars comes in belongs to the debtor.

\* \* \* \* \* \*

THE COURT: Well, I misunderstood. I thought you represented to the Trustee and the Court yesterday that you'd already retained or they had already retained a Boston law firm to bring this litigation.

MR. WILLIAMS: They have two law firms that have agreed to talk to us; and I'm trying to obtain the file so that we can sit down and select one who would go along with it; but now to say to them, "You know, the first hundred thousand dollars you collect is not subject to any attorney's fees"—I mean why shouldn't it be subject to attorney's fees? His hundred is the same as my hundred. All I'm saying is that before—

THE COURT: Well, I'll tell you why. May I mention one reason why? Tell me if I'm wrong. Did you not represent to the Court yesterday that before any lawsuit was going to be brought, that there would be a tremendous amount of discovery to be done and that no law firm had agreed to do that until there was a retainer paid in advance—

MR. WILLIAMS: That's right.

THE COURT: —and that that's really what your client was willing to do, pay the advance retainer fee in order to get this suit going and that was the real reason why you couldn't bid competitively with . . . ?

MR. WILLIAMS: Exactly. No, I don't disagree with any of that.

THE COURT: Well—well, then—

MR. WILLIAMS: I'm just saying that if she pays the up-front money, she ought to at least get the up-front money back first before any—

THE COURT: Well—

MR. WILLIAMS: In other words, I'm not expecting my client to get a dime before Mr. Dahar gets a hundred thousand.

THE COURT: You misunderstand the nature of the problem here. You, sir, are not dealing in an arm's length negotiation with a Trustee. What you are doing is is you are affecting the rights of third-party bidder over here who bid against you with an understanding what the terms of the bidding were, and now you are here suggesting that those terms be modified and, thereby, modify the rights of that third party who wanted to bid against you, and I do not understand how you can do that without giving an opportunity to the other party to come forward with the bidding as she may wish to do on behalf of her client; and in addition, that can only be done if the Trustee is willing to permit it to be done. If he is satisfied with his bargain as it is made, then there'll be no further bidding and there can't be. If he's not satisfied, that he's willing to represent to this Court that he'll allow the bidding you are satisfied that you want to let her have the opportunity to do this, that's another thing. Other than that, the Court has no choice but to bind the parties on the current bargain as it was struck in this Court.

MR. WILLIAMS: It's not my intention here today, Your Honor, to try to modify anything. My intention—when I was bidding and when I made the agreement with Mr. Dahar, I went along with the only written piece of evidence that we

have here as to what the hundred thousand dollars meant; but if the Court—

THE COURT: No. There is—

MR. WILLIAMS: —if the Court's interpretation was that we don't get the attorney's fees back first, that's fine.

\* \* \* \* \* \*

(Transcript, July 12, 1990, at pp. 43–44, 47–49)

\* \* \* \* \* \*

THE COURT: It [the proposed order] says: "The successful bidder for the assignment of the pending lawsuit in the U.S. District Court for the District of New Hampshire is Frances Murray subject to the following conditions." My understanding is that they're not going to assign this claim to—

MR. DAHAR: Well, I think it goes on further. B explains that. It says that she's going to receive my—on my—"in my name and on my behalf."

THE COURT: Well, I understand that; but I don't think if I were you, I'd use the term of art assignment.

MR. DAHAR: Well, we can—

THE COURT: It is simpler to merely indicate—

MR. DAHAR: Well, we can say this—

THE COURT: —first of all—

MR. DAHAR: Just say—

THE COURT: —that Frances will pay over forthwith to the Trustee, Victor Dahar, the sum of fifteen thousand dollars; and it's not a refundable bond. It is a payment to become part of this debtor's estate. Second, the second Paragraph B is correct; but the preliminary paragraph one should be amended to reflect the fact that—

MR. DAHAR: If we just delete the words and just say the "successful bidder of the pending lawsuit" and just take out for—those three words?

THE COURT: No. I don't think you need a one at all.

MR. DAHAR: All right.

THE COURT: It's sufficient to say as ordered, judged, and decreed, one, that

Frances Murray will pay fifteen thousand over to the debtor's estate; that, two, she'll retain counsel to represent the U.S. trus—the Trustee in bankruptcy for Silver Brothers, Inc. against whoever it is that litigation is against on behalf of the debtor's estate; and that the first one hundred thousand dollars of recovery will belong to the debtor's estate before the payment of attorney's fees and any balance thereof will belong to Frances Murray. And Paragraph D is "as you may deem it appropriate." Now is there anything further that needs to be clarified with regard to this matter? Your representation to this Court, Mr. Dahar, was that the difference of five thousand dollars bid by the brewing company as opposed to Murray's was not as good a benefit to this debtor's estate as the possibility of getting a hundred thousand in as a result of that litigation—

MR. DAHAR: That's correct.

THE COURT: —net of costs.

MR. DAHAR: To the estate. That's correct.

THE COURT: And that is the reason why this Court permitted that to take place.

MR. DAHAR: I'll revise that last page with those corrections, Your Honor; and I'll resubmit it.

THE COURT: Thank you. Anything further? Is there anything you have to say with regard to this matter, counsel?

MS. BEAUCHESNE: I do not, Your Honor.

MR. DAHAR: I'll have that back before noontime, Your Honor.

\* \* \* \* \* \*

(Transcript, July 12, 1990, at pp. 50–52)

The foregoing extracts from the transcript of the hearings indicate that Judge Goodman rejected a form of order that had a decretal paragraph approving outright assignment of the counterclaim to Mrs. Murray. The order as re-submitted and entered deletes that paragraph.[3]

---

**3.** See Court Doc. No. 227, p. 4 above.

### Phase II

Thereafter nothing of any significance or relevance happened in the bankruptcy case until July 31, 1992, when Frances R. Murray filed a "Motion to Allow Frances Murray to Continue to Prosecute an Action in the United States District Court for the District of New Hampshire Against the Miller Brewing Company in the Name of Victor W. Dahar, Trustee in Bankruptcy for Silver Brothers Co., Inc." (Court Doc. No. 237). This motion was precipitated by an Order of the District Court dated July 20, 1992 (copy attached to Mrs. Murray's Motion) instructing the parties "to seek a determination from the Bankruptcy Court as to Mrs. Murray's rights under its order of July 12, 1990 . . . ." Mrs. Murray claimed to have proceeded with all due diligence and asserted that the six month time limit in Judge Goodman's order was not an unequivocal mandate.

Miller objected to Mrs. Murray's motion (Court Doc. No. 238) and filed its own "Motion for Determination as to Ownership of the Silver Bros.' Counterclaims" (Court Doc. No. 239) and a "Motion for Pre–Trial Conference" (Court Doc. No. 240). Miller's primary assertion was that it had requested dismissal of the counterclaims by the District Court due to the lapsing of the six-month period, and since the District Court had deferred to this Court regarding the import of the six-month requirement, this Court should "determine that the U.S. District Court should dismiss the Silver Bros.' counterclaims for failure to prosecute." Alternatively, Miller asked this Court to determine that the Trustee is the real party in interest with respect to the counterclaims, or to renotice the matter to all creditors for bidding on the counterclaims.

Mrs. Murray filed a "Response . . . and Cross Motion for Modification of Order to Conform to Bench Ruling" (Court Doc. No. 247), stating that the six-month time limit was not part of Judge Goodman's bench ruling but rather had been inserted into the proposed order by the Trustee, which proposed order was subsequently signed by Judge Goodman. Mrs. Murray requested the court to vacate the July 12, 1990 sale order and reissue said order without the six-month time limit. Miller filed an Objection to this cross motion.

A telephonic hearing was held before Judge Goodman on September 2, 1992. Judge Goodman entered an Order which provided that the Motion of Frances R. Murray was continued generally, and provided further:

2. Victor W. Dahar, Trustee in Bankruptcy for Silver Brothers Co., Inc., shall have 20 days from September 2, 1992 to file an appropriate pleading to reopen the bidding for, or for a determination as to, ownership of the Silver Brothers' Counterclaims, failing which the Court will proceed on the Motions of Frances R. Murray and Miller Brewing Company.

*In re Silver Brothers Co., Inc.,* BK No. 88–395, *Order,* slip op. at 2 (Sept. 23, 1992) (Court Doc. No. 245).

On September 22, 1992, the Trustee filed a pleading entitled "Trustee's Motion for Procedural Orders and Notice of Joinder in the Motion of Miller Brewing Company" (Court Doc. No. 244), in which the Trustee requested the Court to proceed with Miller's "Motion for Determination of Ownership . . ." and to schedule an auction sale hearing to reopen the bidding on the Silver Brothers' counterclaims.

This generated another telephonic hearing on December 2, 1992, which resulted in an Order dated December 8, 1992 (Court Doc. No. 250). Judge Goodman vacated the July 12, 1990 Order on the finding that Mrs. Murray had breached the terms of that Order in that she "has been dilatory in her pursuit of the said Counterclaims and, accordingly, has failed to meet the diligence and time-related terms and conditions of the sale to her." This December 1992 Order was appealed by Frances R. Murray on January 14, 1993 (Court Doc. No. 255) after the Court denied her Motion to Reconsider (Court Doc. No. 251).

### Phase III

The Trustee then filed a new "Notice of Intent to Sell" dated February 2, 1993 (Court Doc. No. 260), in which the Trustee stated

his intent to sell the counterclaims to Miller Brewing Company for $50,000.00, subject only to any higher bid. Mrs. Murray filed an Objection dated February 23, 1993 (Court Doc. No. 265), in which she contends in part that the proposed sale price is less than the prior offer by Murray and less than the claim's fair market value, and that the Trustee should not be allowed to essentially compromise the largest asset of the estate, i.e., the estate's claim against Miller, without demonstrating that the settlement is fair and reasonable and without disclosing that Miller would retain its $25,000,000 claim against the estate.

Meanwhile, Mrs. Murray had also filed a motion for reconsideration and requested a stay of prosecution of the counterclaim pending appeal. She had also initiated an adversary proceeding seeking injunctive relief against the Trustee and Miller. At the hearing held telephonically before Judge Goodman on March 10, 1993, and at a further hearing held before me on March 15, 1993, the Trustee and Mrs. Murray indicated that they had reached a compromise of all matters.

Thereafter the Trustee filed a "Motion for Approval of Agreement" dated April 15, 1993 (Court Doc. No. 277). The proposed Agreement provided that Mrs. Murray would pursue the counterclaims against Miller; that the first $100,000.00 of any recovery would be paid to the Trustee; that the next $50,-000.00 would be paid to Mrs. Murray; that the Trustee would then get 20 percent of any amount over $150,000.00; and the Agreement then made certain provisions concerning payments of attorneys' fees. An Objection (Court Doc. No. 279) was filed by Stewart F. Grossman, a defendant in the District Court lawsuit, and as a claimant asserting an administrative claim against this bankruptcy estate in the approximate amount of $250,-000. Objections were also filed by Shawmut Bank, N.A. (Court Doc. No. 280), and by Miller Brewing Company (Court Doc. No. 282).

A hearing was held before visiting Judge Goodman on May 20, 1993. By Order dated May 26, 1993 (Court Doc. No. 284), Judge Goodman made the following rulings:

1. The Agreement as outlined was denied;

2. The Trustee's request to withdraw the Notice of Sale concerning the proposed sale to Miller for $50,000.00 was granted;

3. The Trustee's request to sell the counterclaims by bidding process was denied;

4. The Trustee was directed to request the appointment of an attorney to represent the Trustee in the United States District Court lawsuit;

5. The Trustee was authorized to retain a lawyer to review the value of the counterclaims and determine whether the matter should be settled and, if so, for what amount;

6. The Trustee was directed to enter good faith settlement negotiations with Miller Brewing Company;

7. The Trustee was authorized to seek court approval for the appointment of an attorney to represent him in these settlement negotiations if necessary; and

8. The Trustee was further authorized in his discretion to pursue the counterclaims in the United States District Court lawsuit, and to file an application for an attorney to represent him therein on a contingent fee basis.

This May 1993 Order was appealed by Frances R. Murray on June 2, 1993 (Court Doc. No. 285).

*Phase IV*

The foregoing summarizes the status of the various matters in this Court, reflected in the record, prior to the hearings and disposition made by U.S. District Judge Barbadoro on the pending appeals.

After a hearing on the appeals on January 18, 1994, Judge Barbadoro affirmed Judge Goodman's Order of May 26, 1993 in an Order entered January 24, 1994 (Court Doc. No. 293). However, footnote one of the written Order indicates that the District Court, in a bench ruling at a hearing on January 18, 1994, reversed the December 1992 Order that had vacated this Court's July 12, 1990

Order. As District Court Judge Barbadoro explained in his January 24 Order:

> I have already reversed the Judge's decision to vacate his July 1990 order for the reasons set forth in my January 18, 1994 bench ruling. Thus, while I have affirmed the order which is the subject of this appeal, the order I affirm here can have no effect because the court cannot decide whether to permit the counterclaim to be resold until it first decides, after subsequent proceedings, whether to again vacate the July 1990 order.

*In re Silver Brothers Co., Inc.*, Civil No. 93–388–D, slip op. at 2, n. 1 (Jan. 24, 1994). The transcript of the January 18, 1994 hearing before Judge Barbadoro confirms in context that Judge Barbadoro was considering the appeal of the December 1992 Order vacating the July 1990 Order.

Based on the following statements by the District Court Judge in the limited transcript of the January 18, 1994 hearing, I think it is fair to say that the bench ruling reversed the December 1992 Order because the parties had not been given an adequate opportunity to be heard on the merits prior to Judge Goodman's ruling. At the hearing, Judge Barbadoro, talking to counsel and reviewing Judge Goodman's comments from the transcript of the December 1992 telephonic hearing, remarked:

> "This is a pretrial in this matter." Now, once he [Judge Goodman] says that, can you point me to anyplace in the record prior to his ruling where he indicates to any reasonable person that he is in fact going to rule on the merits of the contested matter? ... [I]n the absence of that, I'm saying that whatever Judge Goodman's practices are, he's got to give people notice he's going to rule on the merits of their claim."

> * * * * * *

> [T]he underlying matter ... was a ... contested matter, and if it's a contested matter, you can't have it determined in the way that Goodman determined it.... He lacked the authority to dispose of the matter in a summary way.... He, in fact, granted summary judgment to Miller [Brewing Company] with respect to that

contested matter with no notice and no opportunity to respond.

> * * * * * *

> I do not mean to suggest in any way that summary judgment is inappropriate in this case. It may well be that no reasonable finder of fact could reach any other conclusion other than that Murray was dilatory. But all I'm saying is give Murray a chance to come up with affidavits to show you: wait a minute, Judge, there is a material issue of fact here that's genuinely in dispute, and therefore give us a full hearing. But by my ruling I don't want anybody to get the impression I'm saying that you couldn't grant summary judgment here, just that the way, in effect, it was done was not in accordance with the bankruptcy rules.

> * * * * * *

> ... I can tell you there is at least one, and I believe more than one, First Circuit case that says it is absolutely reversible error to grant summary judgment without giving the other side notice that you're considering it and a full opportunity to respond and I assume the same rule would apply in bankruptcy court. That's why I've ruled as I have on it. I don't think it's fair to one side to summarily dispose of the case without giving them notice that's what you're doing.

*In re Silver Brothers Co., Inc.*, Civil No. 93–90–B and Civil No. 93–388–B, *Transcript* pp. 34–35, 36–37, 43–44 (Jan. 18, 1994).

With regard to the May 26, 1993 Order, Judge Barbadoro found that Judge Goodman did not abuse his discretion in refusing to approve the new agreement negotiated between Frances Murray and the Trustee. After reciting the negotiations and conflicting offers the Trustee obtained in February and April of 1993 from Murray and Miller, respectively, Judge Barbadoro stated his reasoning in support of affirming the denial of approval of the Murray 1993 offer as follows in his Order dated January 24, 1994:

> At the outset, I note that Murray characterizes her second agreement with the Trustee as an "agreement in compromise

and settlement" of her first appeal, while Miller argues that the agreement is really an asset sale agreement in disguise. Given that the effect of the agreement is to convey an asset, the counterclaims, and that the record contains no evidence of any proposed compromise or settlement of the first appeal, I agree with Miller. Regardless of how the agreement is styled, however, the issue remains the same—did the Bankruptcy Judge abuse his discretion in denying approval of the agreement? *See, e.g. In re WPRV–TV, Inc.*, 983 F.2d 336, 340 (1st Cir.1993) (sale); *In re Continental Inv. Corp.*, 672 [637] F.2d 8, 9 (1st Cir. 1980) (compromise and settlement).

Although bankruptcy judges have broad discretion in determining whether to approve the sale of an asset or an agreement to settle litigation, *see In re Rodriguez*, 123 B.R. 153, 154–55 (Bank.D.P.R.1991), they must reach their decision only after forming an independent judgment as to the merits of the proposed sale or settlement. *See In re Boston & Providence R. Corp.*, 673 F.2d 11, 12 (1st Cir.1982); *Rodriguez*, 123 B.R. at 154–55. The parties to the agreement bear the burden of providing the judge with the facts necessary to make this independent judgment. If the parties merely provide conclusory allegations, and thus deprive the Bankruptcy Court of a record adequate to support the agreement's approval, the "Court is precluded from determining whether the settlement falls within the lowest bounds of reasonableness ...," *In re Correa*, 123 B.R. at 155, and cannot approve the agreement. *See In re Boston & Providence R. Corp.*, 673 F.2d at 12–13.

Here, the Trustee did not provide the Bankruptcy Court with the information necessary to determine whether the settlement agreement was in the best interests of the Silver Bros. creditors. First, he failed to provide the Bankruptcy Court with an assessment of Murray's likelihood of success on her first appeal (the appeal is not even mentioned in the record or in the proposed agreement). Without this information, the Bankruptcy court apparently was faced with assessing whether Murray's offer of an additional 20% of any recovery above $150,000, by itself, was a good deal for the estate. Second, beyond asserting that "if there is a recovery, [the sale to Murray] would be in the best interests of the estate....", the Trustee also failed to independently evaluate the merits and value of the counterclaim. As a result, the Judge was left with only Murray and Miller's partisan assessments to guide him. Not surprisingly, the Judge refused to approve the agreement and instead ordered the Trustee to hire independent counsel to evaluate the counterclaim and then determine how next to proceed.

[Order, Barbadoro, J., January 24, 1994, Court Doc. No. 293].

The effect of the January 24, 1994 Order of the District Court is to affirm the bankruptcy court's May 26, 1993 Order; to reverse the bankruptcy court's December 1992 Order vacating the July 1990 Order; to dismiss the pending Murray appeal from the December 1992 Order; and to remand the case to the bankruptcy court for further proceedings to determine in an appropriate procedural fashion whether the July 1990 Order should or should not be vacated. In other words, if the bankruptcy court on the remand determines that the July 1990 Order should not be vacated that would nullify the May 1993 Order providing for further procedures for sale, settlement, or litigation of the counterclaim asset in question. If, on the other hand, the bankruptcy court determines that the July 1990 Order should be vacated, the conditionally affirmed May 1993 Order will provide appropriate procedures for the Trustee to follow in realizing the value of this asset.

This interpretation is confirmed by the following comments made by the District Court Judge to clarify the interrelationship between Judge Barbadoro's vacating of the December 1992 Order and his affirmance of the May 1993 Order:

"Well, don't I have to remand the matter back to Judge Goodman for him to determine the contested case, because there can't be any sale of the assets to anybody else until and unless he rules against you [Frances R. Murray] with respect to the first sale of the assets."

*In re Silver Brothers Co., Inc.,* Civil No. 93–90–B and Civil No. 93–388–B, *Transcript* at p. 38 (Jan. 18, 1994).

### Phase V

Following the remand this Court, in light of the complexity of the matter, entered a Procedural Order on March 4, 1994 (Court Doc. No. 296) setting a status hearing on June 6, 1994 to consider appropriate further procedures and hearings to resolve the question remanded. The Order indicated that the Court would schedule an evidentiary hearing as to whether the alleged nonperformance by Mrs. Murray in pursuing the counterclaims would justify vacating the 1990 Order. The Court indicated that in this context it would consider as relevant the original pleadings presented to Judge Goodman at the time he issued his December 1992 Order as follows: (1) the "Motion to Allow Frances Murray to Continue to Prosecute an Action, etc." filed by Frances Murray on July 31, 1992; (2) the "Objection" thereto filed by Miller Brewing Company on August 24, 1992; (3) the "Motion for Determination as to Ownership of the Silver Brothers' Counterclaims" filed by Miller Brewing Company on August 24, 1992; (4) the "Trustee's Motion for Procedural Orders and Notice of Joinder in the Motion of Miller Brewing Company" filed by the Trustee on September 22, 1992; (5) the "Response to Trustee's Motion for Determination as to Ownership of the Silver Brothers Co., Inc. Counterclaims" included as part of a pleading[4] filed by Frances Murray on November 27, 1992; and (6) an Objection thereto filed by Miller on December 2, 1992.

The Court in its March 4, 1994 Procedural Order noted that aside from the nonperformance issue involving Frances Murray's actions following the July 1990 Order ". . . . the evidentiary hearing might also address the additional question of whether the sale of the counterclaims provided for by the July 1990 Order was 'improvident' within the case law that permits in limited circumstances the

voiding of a bankruptcy sale order determined to be improvident."

In a further Procedural Order entered June 7, 1994 the Court noted that Frances Murray contended that the issue in question should be determined under ordinary rescission law involving private sale contracts. The Court in that Order responded as follows:

> [T]he Court is presently of the view that rescission case law developed in contractual transactions between private parties has no applicability to the question of whether this Court should vacate its own order of July 1990 approving a sale. A bankruptcy court that enters an order approving a sale or assignment of assets during the administration of the bankruptcy estate in effect is a party to the transaction, in a unique way involving institutional concerns of the bankruptcy court, that does not pertain to the normal questions of rescission of contractual transactions between private parties not involving court involvement.

The Court indicated that that ruling was subject to possible reconsideration if Frances Murray could come forward with a legal memorandum indicating that ordinary rescission law had been applied in a situation comparable to the matter in issue, i.e., a sale contract approved by a bankruptcy court order in which the issue was whether the bankruptcy court Order should be vacated.

At a further and final pretrial hearing on June 17, 1994, the Court noted that Frances Murray could cite no such case authority to support her contention regarding rescission law and the Court ruled by Order dated June 21, 1994 that the motion to vacate the sale Order would be determined "on the basis of case law dealing with the vacating of bankruptcy sale Orders." (Court Doc. No. 302) The Court dictated its findings and conclusions in that regard into the record of the June 17, 1994 hearing and the same are incorporated again by reference.

---

4. This pleading also included also a "Cross Motion for Modification of Order to Conform to Bench Ruling" in which Frances Murray sought to have the original July 1990 Order changed to what she alleged was the actual bench ruling. This contention, however, was rejected by Judge

Goodman in a bench ruling at the December 8, 1993 hearing and *that* ruling was affirmed by the District Court in its own bench ruling of January 18, 1994. See Order entered on this issue on June 9, 1994 by this Court (Court Doc. 299).

The June 21, 1994 Procedural Order set the matter down for a two-day trial on August 30 and August 31, 1994. Following receipt of post-trial memorandums ending on October 6, 1994 the matter was submitted for decision by this Court.

## FINDINGS OF FACT

The testimony and exhibits received in the evidentiary hearing before the undersigned judge addressed the foregoing facts of record but enlarged upon those facts in terms of what was going on "behind the scenes" both before, during, and after the Court hearings which resulted in the July 12, 1990 Order.

While attorney Williams was acting as attorney for Frances Murray is was clear from the outset to Williams and the Trustee that David Murray was also very interested and very much involved. Frances Murray however was also directly involved and motivated to pursue the litigation with regard to Miller Brewing Company, since she worked in David Murray's companies for a period of years and felt that Miller's actions had caused the collapse of the various family businesses and injured herself and her family. It also appears from the evidence before me that Frances Murray had saved from her various employments at least the $15,000 which was paid over to the Trustee in conjunction with the July 1990 Order.[5]

After the entry of the July 1990 Order Frances Murray herself had no further direct involvement or activity in pursuing the litigation against Miller Brewing Company. It was left to Joseph Williams to obtain the litigation court file and it was left to David Murray to obtain the retention of appropriate litigation attorneys to pursue the civil lawsuit.

Joseph Williams knew by September 1990 that Trustee Dahar did not have the civil lawsuit file. Williams did not actually obtain the civil lawsuit file until June 11, 1991. There was nothing that would have prevented Williams from obtaining the civil lawsuit file by September of 1990, at the latest, had he taken any effective and expeditious actions in that regard.

David Murray took no effective action to retain litigation attorneys to handle the civil lawsuit until September of 1991 when the Wadleigh, Starr, Peters, Dunn & Chiesa law firm in Manchester, New Hampshire was retained. Although he testified that he wanted to retain New Hampshire attorneys he made no contact whatsoever with New Hampshire attorneys until July of 1991.[6]

While David Murray made contact with two law firms in Boston about possible retention for the civil lawsuit, neither he nor Frances Murray made any offer to said law firms to advance the costs of litigation, nor did David Murray approach those firms on the basis of any retention other than a straight contingency fee retention.

Nothing whatsoever was done by either Frances Murray or David Murray to effectively pursue and advance the civil lawsuit counterclaim against Miller Brewing Company until the retention of the Wadleigh firm in September of 1991. Wadleigh at that time was retained with a $30,000 retainer.

Even after the retention of the Wadleigh law firm the civil lawsuit showed no real progress inasmuch as the standing of Frances Murray became an issue in January of 1992 when Miller filed a pleading in the civil action questioning Frances Murray's standing to pursue the counterclaim. Judge Devine thereafter entered the Order of July 20, 1992 referred to above directing the parties to come to the bankruptcy court to resolve the question of Frances Murray's standing. This then resulted in the hearings, appeals,

---

5. While there may be some controversy between David Murray and the trustee in his own individual case as to whether some of that money might have come from David Murray there is no such showing in the record before me and moreover is irrelevant to the transaction before this Court.

6. The Court take judicial notice that a similar lawsuit against the Coors Brewing Company was going on in this Court in the Fall of 1990 which resulted in a judgment against Coors entered on July 24, 1991, see In re Globe Distributors, Inc., 129 B.R. 304 (Bankr.D.N.H.1991), aff'd by District Court order dated June 2, 1992 (Adv.Court Doc. No. 110), which fact should have been apparent to Dahar and David Murray had they been interested in timely retention of New Hampshire counsel. Wadleigh, et al. were in fact the attorneys for the debtor in that litigation.

and remand during the 1992–1994 period which has resulted in the evidentiary hearing before the undersigned judge to resolve that question.

The evidence before this Court establishes that neither Frances Murray nor David Murray had available the $50,000 amount referred to in the hearings before Judge Goodman to cover the cost of litigation, or any portion thereof, during the six-month period following entry of the July 12, 1990 Order.

The representation by attorney Williams at the July 1990 hearings to the effect that Frances Murray had available attorneys ready to pursue the litigation, and that she had available the necessary funds to fund the cost of litigation, and that she would immediately proceed with that retention and the advancement of funds, were not true and in effect were a misrepresentation to the Court. Whether attorney Williams was relying only on the information given him by David Murray and Frances Murray, and whether if he were so relying that reliance was reasonable in the circumstances, is not an issue necessary to decide in the present case. The fact is that the Court clearly was relying upon the representations as to the immediacy of the retention of attorneys and the immediacy of financing the cost of litigation in considering approval of the lower cash offer from Frances Murray. Those representations in actual fact were not true and could not be performed within the six months specified.[7]

The materiality of the representations with regard to immediate retention of attorneys and immediate commencement of advances of litigation costs appears not only from the transcript of the hearings, and Judge Goodman's reactions to the various questions raised and representations made, but also from the simple fact of his approval of a $15,000 offer instead of the $20,000 offer by a competing bidder. That unusual action is explainable only in terms of the consideration given by the Court to the representations that effective action would be undertaken immediately by Frances Murray to pursue the lawsuit, to fund the litigation cost, and to provide the Trustee with the first $100,000 that might be recovered.

David Murray was aware of the six month proviso in the July 1990 Order and testified that it was "a concern of mine" but that his more important concern was to find a competent lawyer on a contingency fee basis. He admitted that he never actually read the July 1990 Order until his deposition in July of 1994.

The absence of any effective action to pursue the counterclaim against Miller Brewing Company for over a year after the July 1990 Order is explainable not only in terms of the lack of funds, and the lack of any effort to retain an attorney on anything other than a contingency fee basis, but also in terms of how the Court actually ended up approving the transaction. Mr. Williams made a strenuous effort at the July 12, 1990 final hearing to have the Court Order provide that the $100,000 for the bankruptcy estate would come in only after costs of litigation were deducted from any monies received from a successful judgment. The Court adamantly refused to approve the transaction unless Frances Murray in effect would have to absorb the cost of litigation, i.e., if the cost were $50,000 the judgment would have to exceed $150,000 before she would receive any monies herself, and Mr. Williams ultimately agreed to that term and condition of the Order.[8] While that ultimate term was obviously not to the liking of either Frances Murray or David Murray it does I believe explain David Murray's conduct thereafter in only seeking a contingency fee attorney with no advancement of litigation costs during the six months stipulated and beyond.[9]

---

**7.** While it is arguable that the entire $50,000 for litigation cost would not need to be expended in that six month period it is clear that representation was made to the Court that attorneys would be retained and the cost of litigation incurred during that six month period would in fact be advanced by Frances Murray.

**8.** Williams also recognized that the initial $15,000 paid would be forfeited if Frances Murray didn't pursue the lawsuit as required. See Transcript, pp. 49–52.

**9.** Frances Murray made no attempt to have the Order reconsidered or modified following its entry prior to the dispute raised by Miller Brewing

The record and the evidence before me establishes that Trustee Dahar did absolutely nothing to enforce the conditions of the July 1990 Order until Miller precipitated the question in their various pleadings and their raising of the issue before Judge Devine in the civil lawsuit. Notwithstanding the fact that Frances Murray gave no reports as to progress with regard to the litigation, as required by the Order, and notwithstanding that there was no indication given to Trustee Dahar within the six months that any attorney had been retained, or that any funds for litigation had been advanced by Frances Murray, the Trustee took no action to bring the matter before the Court to determine whether to enforce, modify, or vacate the Order in the circumstances until Miller raised the standing question.

The failure of Frances Murray to perform her undertakings pursuant to her offer, and the failure of the Trustee to precipitate the question earlier himself, has caused a delay of some four years to the creditors of this bankruptcy estate in obtaining the benefit of any judgment that might ultimately be obtained against Miller Brewing Company in the civil lawsuit.[10]

The delay has not caused any damage in the sense that the counterdefendant Miller Brewing Company might not be able to respond to any judgment ultimately obtained in the civil lawsuit. Miller itself has not been prejudiced by the delay and in fact has been able to delay for years the trial and entry of any judgment against itself due to the "standing" question relating to Frances Murray stemming from the terms and conditions of the July 1990 Order and the Trustee's failure to raise the issue at the end of 1990.

Trustee Dahar currently has in excess of $500,000 in his Bank account pertaining to the bankruptcy estate in this 1988 case. There has been no recent activity or claims against that money asserted by any third parties. It is not apparent from the case

record as to why that money has not yet been distributed at least in partial dividends to creditors. Moreover, at the time of the July 1990 hearing he had in excess of $300,-000 in his account. Notwithstanding the foregoing, Trustee Dahar has never expended any funds whatsoever to get an outside evaluation of the merits of the counterclaim from a litigation specialist who could give him, and the Court, an appropriate report as to the range of possible results that might obtain from a full-scale aggressive pursuit of the lawsuit.

The July 12, 1990 Order was entered on a record that did not include any showing by the Trustee or any other party as to the possible range of values of the asset in question.[11]

### RELEVANT CASE LAW

■ Sales approved by a bankruptcy court are not simple commercial contractual undertakings between two independent parties. Because the sale of an asset in a bankruptcy estate necessarily impacts parties other than the particular parties to the transaction, judicial sales encompass institutional and policy concerns not involved in ordinary commercial transactions. Application of the ordinary contractual law concerning private party sales transactions is inappropriate in this context. *In re Chung King, Inc.*, 753 F.2d 547, 551 (7th Cir.1985). See also *In re Madrid*, 21 B.R. 424 (BAP 9th Cir.1982), *aff'd* 725 F.2d 1197 (9th Cir.1984), *cert. denied* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984); *In re Rancourt*, 153 B.R. 380 (Bankr.D.N.H.1993); *In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir. 1990). Concerns of institutional integrity translate into a strong policy of finality in the judicial sale process. *In re WPRV–TV*, 983 F.2d 336 (1st Cir.1993); *In re Cable One CATV*, 169 B.R. 488 (Bankr.D.N.H.1994); *In re Winston Inn & Restaurant Corp.*, 120 B.R. 631 (E.D.N.Y.1990).

---

in the civil lawsuit as to her standing to pursue the counterclaim.

**10.** Whether the trustee's inaction could somehow waive or modify the terms of the Court Order binding upon Frances Murray will be dealt with separately below.

**11.** The question of whether the "auction" itself established relevant value will be dealt with below.

There is no contract for sale of a debtor's assets between parties absent approval of the bankruptcy court. *In re Allison Warehouse & Transfer, Inc.*, 145 B.R. 293, 295 (Bankr.E.D.Ark.1992); *Matter of Mann*, 45 B.R. 755, 758 (Bankr.S.D.Ohio 1985). The terms of an auction in a bankruptcy court are established at the call of the hearing and the order confirming the sale is controlling upon the parties as to any conditions of the sale stated at the hearing. *In re Dartmouth Audio, Inc.*, 42 B.R. 871, 875 (Bankr.D.N.H.1984). If there is any ambiguity in the stated terms of sale the bidder has the obligation to bring that matter up for clarification before the call of the sale or the bidder will otherwise be strictly bound to the terms of the sale as called. *Id.* at 875; *In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 342 (Bankr.E.D.N.Y.1993).

The parties to a judicial sale do not have authority to deviate from the provisions of the bankruptcy court order approving the sale. *In re Winston Inn & Restaurant Corp.*, 120 B.R. at 635; *In re Rosecrest Enterprises, Inc.*, 80 B.R. 354 (Bankr. W.D.Pa.1987). The bankruptcy court has exclusive power to determine and deal with the liability of a defaulting purchaser. *Matter of Mann*, 45 B.R. at 758. The successful bidder at a bankruptcy sale is bound by the offer as stated and as embodied in an approval order unless the order is successfully appealed or the court which confirmed the sale vacates the confirming order. *In re Oyster Bay Cove, Ltd.*, supra. It is well settled that a bankruptcy court can vacate a sale order as improvident upon appropriate facts and countervailing equities, even though there was no direct appeal from the sale order. See *e.g.* *In re WPRV–TV*, supra; *Cedar Island Builders v. South County Sand & Gravel, Inc.*, 151 B.R. 298 (D.R.I.1993); *Irvin v. Lincoln Heritage Life Ins.*, 950 F.2d 1318 (7th Cir.1991); *In re Chung King, Inc.*, 753 F.2d 547 (7th Cir.1985).

It is not unusual for bankruptcy courts to vacate orders approving bankruptcy sales, even where an auction sale is involved, where the high bidder has failed to fulfill requirements established by the sale order. See, e.g., *Matter of Mann*, 45 B.R. at 757–58 (in determining damages against a defaulting purchaser, the confirmation of sale is equivalent to a contract of sale and is the nexus of the action); *In re Winston Inn and Restaurant Corp.*, 120 B.R. at 636–637. (upon court authorization of the sale, the successful bidder is bound to consummate the transaction on the terms stated).

In *In re WPRV–TV, Inc.*, supra, the Court of Appeals for this Circuit affirmed a district court's decision to vacate a sale order due to uncertainties as to the performance of the buyer in connection with the sale in the particular case:

We agree with the district court that the shifting positions of PRFC with respect to its finances and the identity of its principals constituted circumstances sufficient to vacate the confirmation. As noted above, it is the principle of finality which serves as the counterweight to the court's discretion. Here, given the uncertainty surrounding PRFC, that principle is outweighed by countervailing equities. Nor would the bankruptcy court's duty to preserve the value of the estate, see *M.R.R. Traders, Inc.* [v. *Cave Atlantique, Inc.*], 788 F.2d [816] at 818 [ (1st Cir.1986) ], be fulfilled by a proposed sale to a party apparently unable to meet future financial obligations, and which might face additional obstacles in obtaining approval of the license transfer from the FCC. Thus, we conclude that the district court's decision to vacate its confirmation of the PRFC sale was not an abuse of discretion.

*Id.* at 341. Cf. also *Cedar Island Builders v. South County Sand & Gravel, Inc.*, 151 B.R. 298, 303 (D.R.I.1993).

Even where no default has occurred by a successful bidder in a bankruptcy sale the bankruptcy court, as a court of equity, nevertheless may vacate such sale orders when it appears that a particular order "was entered through mistake, inadvertence or improvidence." *Mason v. Ashback et al.*, 383 F.2d 779, 780 (10th Cir.1967). The point is that judicial sales, unlike ordinary private commercial transactions, involve parties other than the particular parties to the sale transaction. *In re Madrid*, 21 B.R. at 428 ("It brings into focus the claims of the

debtor's other creditors that they have been deprived of recourse to an asset by an improvident sale.").

 It is recognized however that a bankruptcy court's discretion in this area is limited, for policy reasons as well as for fairness to the parties, and that a court should exercise its discretion to vacate a confirmed order of sale and employ its equitable power to vacate a sale only in extraordinary circumstances.[12] *Matter of Chung King, Inc.,* 753 F.2d at 552; *In re F.A. Potts and Co., Inc.,* 86 B.R. 853 (Bankr.E.D.Pa. 1988), *aff'd* 93 B.R. 62 (E.D.Pa.1988), and *aff'd* without opinion, 891 F.2d 280 (3rd Cir. 1989) (finding of fraud or mistake not necessary when "compelling equities," including events subsequent to confirmation, outweigh finality goal). The order vacating a sale must make explicit, specific findings of compelling equities to justify vacating the sale or it will be an abuse of discretion. *Irvin v. Lincoln Heritage Life Ins.,* 950 F.2d 1318 (bankruptcy court abused discretion by vacating sale order when there was insufficient evidence in record to support finding that price was "grossly inadequate" or the presence of fraud). The requirement of an adequate record applies as well to approval of compromises and settlements. Cf. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) (bankruptcy court approving a compromise has an independent duty to inquire and determine that the record establishes that the compromise is fair and equitable in terms of the possible values involved). The *Anderson* standard was applied in a decision reversing an approval of a compromise for an insufficient record in *Matter of Boston & Providence Railroad Corp.,* 673 F.2d 11 (1st Cir.1982).

In the case of *In re WPRV–TV, Inc.,* supra, the Court of Appeals noted the following as the applicable standard to be used in this context in this Circuit:

As an initial matter, we note first the district court's relatively narrow range of discretion in determining to set aside its prior confirmation order. *Matter of Chung King, Inc.,* 753 F.2d 547, 549 (7th Cir.1985). While the court has broad initial discretion in granting or denying confirmation, the court may vacate a prior order confirming a sale only in very limited circumstances in the exercise of its powers as a court of equity. *Id.* Following confirmation, a court may set aside the sale if "there was fraud, unfairness, or mistake in the conduct of the sale...." *M.R.R. Traders, Inc. v. Cave Atlantique, Inc.,* 788 F.2d 816, 818 (1st Cir.1986) (citation omitted); see also *Chung King,* 753 F.2d at 549–550 ("the existence of fraud, mistake or a like infirmity" would be necessary to vacate a confirmed sale) (citing Bankruptcy Rule 9024, which applies Fed.R.Civ.P. 60 to bankruptcy cases, allowing judgments to be set aside for, inter alia, mistake, inadvertence, surprise, excusable neglect, fraud, misrepresentation or any reason justifying relief).

Such limited discretion is necessary, because " '[i]f parties are to be encouraged to bid at judicial sales there must be stability and a time must come when a fair bid is accepted and the proceedings are ended.' " *Id.* (quoting *In re Webcor,* 392 F.2d 893, 899 (7th Cir.), cert. denied, 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968)). "This policy of finality protects confirmed sales unless compelling equities outweigh the interests in finality." *Id.* (citations and internal quotes omitted); *In re F.A. Potts and Co., Inc.,* 86 B.R. 853 (Bankr.E.D.Pa.), *aff'd* 93 B.R. 62 (E.D.Pa.1988), and *aff'd* without opinion, 891 F.2d 280 (3rd Cir. 1989) (finding of fraud or mistake not necessary when "compelling equities," including events subsequent to confirmation, outweigh finality goal). A "grossly inadequate" sale price is also an acceptable ground for vacating a sale, see *Chung*

---

12. Bankruptcy Rule 9024, which applies Federal Rule of Civil Procedure 60 to bankruptcy cases, allows judgment to be set aside for among other grounds "mistake" or "it is no longer equitable that the judgment should have prospective application" or "any other reason justifying relief from the operation of the judgment."

*King*, 753 F.2d at 550, but such ground is not a factor in this case.

*Id.* at 340–341.

■■■■■ Although a properly conducted judicial sale is virtually beyond reproach, factors which bring into question the integrity of the sale or sale procedure may provide reason to vacate the order to "safeguard the interests of creditors against abuse or mismanagement in the form of collusive, fraudulent, or otherwise improvident sales at inadequate prices". *In re Matter of Halux, Inc.*, 665 F.2d 213, 216 (8th Cir.1981) (citing *In re Park Distributors, Inc.*, 176 F.Supp. 38, 41 (S.D.Cal.1959)); *M.R.R. Traders, Inc. v. Cave Atlantique, Inc.*, 788 F.2d 816 (1st Cir. 1986). There must be sufficient evidence as to possible values in the record to support a finding that the prices paid "are fair and reasonable". *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3rd Cir. 1986); *In re Continental Investment Corporation*, 642 F.2d 1, 4 (1st Cir.1981); *Matter of Whitman Center, Inc.*, 285 F.Supp. 199 (C.D.Cal.1968).

■■■■■ An auction sale with competing bidders is generally considered to establish sufficient value of the asset being sold. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 149. However, the fact that the bankruptcy court conducts what purports to be an "auction" does not necessarily mean that a true auction which establishes the value of the asset being sold has occurred. The mere existence of competing bids for an asset does not inevitably result in an "auction" sale. *Abbotts Dairies, supra*, at 149; *Mason v. Ashback, et al.*, 383 F.2d 779 (10th Cir.1967).

In the *Mason* case the lower court conducted an auction of a chose in action held by the bankruptcy estate but the only bidders were the debtor and the defendant in the lawsuit. The Court of Appeals reversed the lower court order approving the sale on a number of grounds including the following:

> Here the bidders were the only persons, except the creditors, who could have been interested in the price paid for the chose in action. The bidders were each interested in receiving the chose for the lowest possible amount, whereas, the unrepresented creditors were interested in obtaining the greatest possible amount for their benefit at the time of distribution of assets.

383 F.2d at 780. Cf. also *Wolverton v. Shell Oil Co.*, 442 F.2d 666, 669 (9th Cir.1971).[13]

## *CONCLUSION*

■■■■ A bankruptcy court requested to vacate a sale order always has countervailing considerations of the policy of finality underlying bankruptcy sale orders as opposed to occasional showings of strong compelling equities that may override the policy of finality in a particular case. In the present case the Order of July 1990 on its face, and as understood by the Court and the parties at the time, was not intended to be final in any sense pertinent to the question of vacating sale orders.

■■■■ Notwithstanding the fact that the parties throughout have generally referred to the July 12, 1990 Order as a "sale order" a closer inspection of the Order in its context, as developed above, leads to the inescapable conclusion that the actual Order entered was in no sense a final "sale" order. This conclusion remains inescapable even though the courts themselves, including the undersigned Judge, in various procedural and interim orders have referred to the Order loosely as a sale order. The Order of July 12, 1990 was, and is, simply a conditional and interim Order entered whereby Frances Murray bought a six month period within which to

---

**13.** It is of course true that bidders at auctions are generally hopeful of acquiring the asset being sold at the lowest possible bid that will top all other bids. But when there are only two competing bidders for a chose in action, where one of the bidders is the defendant being sued in the pending lawsuit, the competing bids do not involve a true auction in which *both* bidders are seeking to acquire the chose in action for the purpose of ultimately pursuing the cause to real-ize its maximum value in litigation. In such a "bidding contest" between a party seeking to acquire a trustee's rights in a lawsuit, and the defendant in lawsuit, only the former is bidding in terms of what might be realized from pursuit of the lawsuit. The defendant will only bid a lower amount that represents the value to the defendant of acquiring the lawsuit against itself only to secure its dismissal.

demonstrate her capability to finance and proceed effectively with the law suit "in the name of the Trustee" and for this opportunity she paid the sum of $15,000 which was to remain in the estate. This being the true scope and effect of the July 1990 Order the policy of finality which is normally a strong factor arguing against a subsequent attempt to vacate the sale order is not really involved in the present case. Stated otherwise, the policy of finality is vitiated and weakened on the facts of this case as compared to the compelling equities which support vacating of the Order.

 It is apparent from the record of the hearings that the Court was aware of the bankruptcy of David Murray and the repeated questions as to the financial capability of Frances Murray to actually fund the planned litigation against Miller Brewing Company. The Court also had a higher cash offer to consider so that the approval of a lower offer had to be counterbalanced by some substantial undertaking by Frances Murray to proceed with the lawsuit.[14]

The Court deliberately deleted decretal language approving an unconditional assignment to Frances Murray of the counterclaim. The Court instead entered an Order which

can only be interpreted to be an interim order that would allow her to demonstrate within a six-month period that she did have the financial capability to proceed with the lawsuit.

The unusual provision that the $15,000 offered "will be paid to the estate and will be property of the estate" was obviously inserted to make it clear that the $15,000 would belong to this estate regardless of whether she could perform her undertakings in pursuing the lawsuit. Questions of uncertainty as to future performance by the buyer was recognized in *In re WPRV–TV*, 983 F.2d 336 (1st Cir.1993), as a factor that could outweigh the policy of finality with regard to bankruptcy sale orders.

The transaction approved by the Order of July 12, 1990 was approved in the absence of any meaningful analysis or evaluation of the merits and value of the counterclaim asserted by the debtor against Miller Brewing Company for wrongful termination of the debtor's beer distributorship. The Trustee did make some conclusory remarks regarding granting or denial of restraining orders or preliminary injunctions, by Judge Devine and the undersigned Judge, as indicating little value to the

---

14. Miller Brewing Company makes much in its pleadings and briefing to the effect that the sale to the wife of a principal insider of the debtor violates the prohibition and Administrative Order No. 10 (now Administrative Order No. 1103) issued under the authorization of the Local Bankruptcy Rules of this court. That contention has no basis in fact or in law. The Administrative Order specifically does *not* prohibit bankrupts or their privies from buying assets from a bankruptcy estate. It is directed instead to fiduciaries appointed for the bankruptcy estate and employees of the bankruptcy court and other professionals retained by court order. It is permissible and not at all unusual for bankruptcy courts to approve sales of bankruptcy assets to the bankrupt or principals of the bankrupt providing that full and complete notice is given to creditors and no better alternative for disposing of the asset is established. *Traer v. Clews*, 115 U.S. 528, 541, 6 S.Ct. 155, 160, 29 L.Ed. 467 (1885); *Sparhawk v. Yerkes*, 142 U.S. 1, 14, 12 S.Ct. 104, 106, 35 L.Ed. 915 (1891). It is true however that sales to bankrupts or their privies require special scrutiny to assure that such sales are not improvident. *Wolverton v. Shell Oil Co.*, 442 F.2d 666, 669 (9th Cir.1971) ("The Act does not prohibit a bankrupt from buying assets from the trustee.... [but].... a sale to the bankrupt

especially when it is of an asset such as a cause of action of unknown but potentially great value ... offers opportunities for skulduggery that make it suspect."). A corollary to that proposition is that the bankrupt or privies offering to acquire assets from a bankruptcy estate have a special obligation to provide full and complete truthful disclosure to the court and creditors in conjunction with any such offer to purchase assets of the estate. In the foregoing discussion the Court has used the term "bankrupt" advisedly notwithstanding the fact that the current Bankruptcy Code refers to the "debtor" in all chapters of the Code. The Rules differ for a debtor under chapter 7 in a straight liquidating bankruptcy, i.e., the equivalent of the "bankrupt" under the prior Bankruptcy Act, as opposed to a "debtor-in-possession" under one of the reorganization chapters of the Code. In the latter instance, the debtor as a debtor-in-possession is essentially acting as a fiduciary having the powers and obligations of a trustee. *Bankruptcy Code*, § 1107 (11 U.S.C. § 1107). A debtor in possession acting in a reorganization chapter as a fiduciary for the estate would not normally be permitted to purchase assets from the estate. The present proceedings however are under chapter 7 of the Code.

cause of action. (See Transcript filed December 10, 1991, pp. 13–17, 21) Such preliminary actions however are based on an early showing of "likelihood" to justify the extraordinary remedy of injunctive relief and have little to do with a meaningful analysis of a claim in terms of a full-scale trial seeking damages.[15] There was not in this record at the July 1990 hearing, nor has there been introduced into this record at any subsequent hearing, any evidence whatsoever as to the possible range of values attributable to the counterclaim that was "sold" or "assigned" to Frances Murray in 1990. Moreover, the hearing and "sale" process conducted in July of 1990, to the extent that it purported to be an auction, was in fact and law illusory.

In the present case the Court has before it not only the uncertainties as to Frances Murray's ability to pursue the lawsuit to a conclusion, but the record also evidences actual misrepresentations as to her ability to immediately retain an attorney and fund the cost of litigation. The Court clearly relied on those representations in approving the lesser cash offer from Frances Murray albeit with some reservations as demonstrated in the Court's directing that a revised form of order be submitted at the July 12, 1990 final hearing.[16]

The Court also has to consider as a compelling equity in the present case that the approval of the offer from Frances Murray was improvident inasmuch as there was no establishment of any range of values with regard to the asset in question.[17] Essentially what happened in July of 1990 before Judge Goodman was the same as what happened in May of 1993 before Judge Goodman on the revised settlement offer from Frances Murray. Judge Barbadoro found that Judge

Goodman acted appropriately in 1993 in denying approval of that offer in the absence of any value evidence as to the asset in question. The same reasoning and analysis must apply to essentially the same transaction in July 1990.

■ Any bankruptcy court would be loath to vacate a sale order to a good faith purchaser years after the entry of the order. But here I have found that the buyer misrepresented to the Court what the buyer *could* do and how *soon* the buyer would perform its undertakings and accordingly this buyer was not a good faith purchaser. This factor, combined with the other factors and compelling equities enumerated above, justify in my view the entry of an order vacating the July 12, 1990 Order.

■ To recapitulate, the compelling equities which justify the vacating of the July 12, 1990 Order of the Bankruptcy Court, as established by the record in this case, are as follows: (1) The Order of July 12, 1990 was in no sense a final, unconditional "sale order" in view of the uncertainties as to the further performance by the buyer under the terms and conditions of the Order; (2) The policy of finality normally accorded final sale orders entered by a bankruptcy court is accordingly vitiated in the present case by the uncertainties attending the future performance of the buyer as required by the Order; (3) The Order in question was entered as a result of misrepresentations to the Court by the buyer at the sale hearing; (4) The sale hearing to the extent that it appeared to be an "auction" with competitive bidding establishing value was in fact illusory in that regard for the reasons stated; and (5) The Order of July 12, 1990 to the extent that it might be construed

---

15. Indeed, this Court in a similar situation, involving a claim by the debtor Globe Distributors, Inc. alleging wrongful termination of a beer distributorship against Adolph Coors Company, initially denied injunctive relief to restore the debtor to the distributorship, but ultimately handed down a judgment for wrongful termination of the distributorship, with damages in excess of $10,000,000 against Coors, after a full trial. See *In re Globe Distributors, Inc.*, 129 B.R. 304 (Bankr. D.N.H., July 24, 1991), *aff'd* by District Court order dated June 2, 1992 (Adv.Court Doc. No. 110).

16. I can take judicial notice that Judge Goodman was not born yesterday. He was fully aware, as indicated in the hearings, that there might be some question as to her performance of her obligations and therefore structured the order in a fashion to require her to demonstrate her ability to proceed with the litigation during a six month period.

17. Indeed to this date there is not in this case any meaningful analysis or evaluation of the lawsuit.

as a final sale order approving an unconditional assignment to Frances Murray—contrary to my findings and conclusions in that regard—was nevertheless improvidently entered inasmuch as it involved approving a sale of an asset of the bankruptcy estate with no evidence or analysis in the record to establish that the price paid was reasonable in relation to the possible range of values of the intangible asset in question.

■ Frances Murray has responded that even if there were a "breach" of her obligations that breach under private commercial contract law would not justify rescission of a sale but would only relegate the other party to recovery of appropriate damages. That contention however is beside the point, as I have noted in earlier stages of this proceeding, corroborated by the case law cited above, inasmuch as I do not believe that private contractual law governs the exercise of discretion by a bankruptcy court with regard to possible vacating of sale orders.

■ The balancing of the policy of finality against compelling equities that may appear in a particular case is at the heart of the matter when a bankruptcy court is presented with a contention that a sale order should be vacated. In my view a court in that context should not have to "sit still" for a contention by a party that notwithstanding misrepresentations made to obtain a Court Order the Court is precluded from vacating such an Order because under commercial contract law the transaction involved would not be rescinded. There are simply additional parties involved in judicial sales, i.e., the creditors of the bankruptcy estate, and the Court itself, which raise different considerations as to when an order approving such a transaction may be vacated.

■ Frances Murray's contentions that there is no showing to any damage to Miller

Brewing Company from her delay in proceeding with the litigation is also beside the point. The creditors of this estate have been delayed by the buyer's intrusion into the civil lawsuit, and the buyer's subsequent inaction violating its representations to the Court, and the terms and conditions of the Order allowing it to enter into that litigation.

■ Frances Murray finally contends that even if she did violate her representations to the Court, and the obligations imposed upon her by the July 1990 Order, these matters were nevertheless condoned by the Trustee and the requirements of the Order were waived by the Trustee by not pursuing the matter in a more timely fashion. That contention will not fly. No Trustee in a bankruptcy case has any power whatsoever to waive or modify the terms of a Court order except upon formal motion, hearing, and subsequent order of the court with appropriate notice to the affected parties. For whatever reason, this Trustee inexplicably did absolutely nothing during the period in question, until Miller precipitated the issue as indicated above, but while that inaction may justify some surcharge against the Trustee for the costs of delay, and may constitute a basis for denying any compensation to the Trustee for unnecessary work on the plethora of pleadings and orders and appeals that resulted from his inaction, that fact cannot constitute a defense for Frances Murray as to whether the sale order itself should be vacated.[18]

Accordingly, in consideration of the findings of fact and conclusions of law set forth in this opinion, the Court will enter separately an order vacating the Order of July 12, 1990.[19]

### ORDER

This case is before the Court on a motion to vacate an Order of this Court dated July

**18.** The inaction by the trustee may support reliance by Frances Murray in advancing the additional $30,000 to the Wadleigh Law Firm but it does not constitute a modification of the Order entered by the Court.

**19.** The Order to be entered will provide that the $15,000 originally advanced by Frances Murray belongs to, and will remain in this estate, since it was in effect advanced to obtain the six month period in which to demonstrate that she could

proceed with the law suit. The question of any refund by this estate of the $30,000 advanced by Frances Murray to the Wadleigh law firm and/or any recovery of the unearned portion of that retainer from the law firm by either Frances Murray or the trustee will be left for development in a subsequent adversary proceeding to be brought by Frances Murray as she may be advised.

12, 1990 (Court Doc. No. 227) involving conditions of an assignment of a counterclaim cause of action held by the debtor, in a pending prebankruptcy lawsuit between the debtor and Miller Brewing Company, to Frances G. Murray, the wife of David Murray, the debtor's principal officer and stockbroker. An evidentiary hearing was held in August of 1994 on the question, pursuant to an Order on remand entered in January 1994 by District Judge Barbadoro, in conjunction with an appeal taken by Frances Murray from a December 8, 1992 Order of this Court, which vacated the July 12, 1990 Order. The Order on remand required that this Court conduct the evidentiary hearing referred to above.

Following the conclusion of the evidentiary hearing, and review of supplementary briefing by the parties, the Court by separate Memorandum Opinion entered this date has set forth its findings of fact and conclusions of law with regard to the motion to vacate, which findings and conclusions are incorporated by reference. Accordingly, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

1. The subject Order of July 12, 1990 is hereby vacated.

2. The $15,000 paid to the trustee in conjunction with the July 12, 1990 Order shall remain as part of the bankruptcy estate for the reasons set forth in the Memorandum Opinion.

3. The $30,000 retainer paid by Frances Murray to the law firm of Wadleigh, Starr, Peters, Dunn & Chiesa in the fall of 1991 shall not be refunded from the bankruptcy estate unless the right to such refund is established, based upon Frances Murray's arguable reliance upon the inaction of the trustee in not earlier seeking a vacation of the July 1990 Order, in an appropriate adversary proceeding to be brought by Frances Murray in this Court against the trustee and, if appropriate, against the Wadleigh, Starr law firm, either directly or by cross-claim by the trustee as to any unearned portion of said fees. The present Order does not in any way determine the merits of the rights of any party in that regard.

4. The trustee shall immediately resume active involvement in the pending litigation brought by Miller Brewing Company against the debtor in *Miller Brewing Company v. Silver Bros. Co., Inc., Hospitality Holdings Corp., and Stewart F. Grossman, Trustee of the Murray Creditors' Trust*, Civil Docket No. 88–CV–229–B pending in the U.S. District Court for the District of New Hampshire. In this regard, the trustee shall comply with all requirements of Judge Goodman's Order of May 26, 1993 (Court Doc. No. 284) (copy attached as an Annex for ease of reference) which Order was affirmed by Judge Barbadoro in his Order on appeal entered January 24, 1994 (Court Doc. No. 293) albeit with suspension of the effectiveness of the May 1993 Order pending the ultimate determination as to whether the July 1990 Order would be vacated.

5. Miller Brewing Company's requested findings of fact and rulings of law (Court Doc. No. 318) are granted with regard to paragraphs 11 through 23, 26, 34, and 36. All other requests are denied except to the extent that they, or portions thereof, are included in my specific findings and conclusions.

6. The Court reserves jurisdiction with regard to any questions as to possible surcharge, reduction in fees, or alternative sanctions stemming from the inaction of the trustee with regard to the counterclaim asset in question, for separate subsequent proceedings as may be brought in this case by the United States Trustee or any other party in interest. The present Order does not in any way determine the merits of the rights of any party in that regard.

DONE and ORDERED.

### ANNEX

### UNITED STATES BANKRUPTCY COURT

#### FOR THE DISTRICT OF NEW HAMPSHIRE

In re: Silver Brothers Co., Inc. Debtor

Bk. 88–00395 Chapter 7

*ORDER*

The Order on the Motion for Approval of Agreement filed by Victor W. Dahar, Trustee

in Bankruptcy on May 20, 1993 after hearing is as follows:

1. The request to approve the trustee's agreement as outlined in the motion dated April 14, 1993 is hereby denied.

2. The request for the trustee to withdraw the Notice of Intent to Sell to Miller Brewing Company the counterclaim by the trustee for $50,000.00 is hereby approved and granted.

3. The process of bidding for the sale of the Miller Brewing Company counterclaim is hereby denied.

4. The trustee may file a notice to sell for value the claim after the trustee has determined the value of said claim, if a sale is in the best interest of debtors estate.

5. The trustee is ordered to file for the appointment of an attorney to represent the trustee to go forward in the U.S. District Court for the District of New Hampshire in the pending case by Miller Brewing Company in that court and the counterclaim of Silver Brothers Co., Inc., said order to be noticed to all creditors with a hearing date to be set.

6. Victor W. Dahar, trustee, is further authorized to retain the services of a lawyer for the limited purposes of reviewing the value of the Silver Brothers Co., Inc. counterclaim against Miller Brewing Company to determine whether or not the matter should be settled and the dollar amount that it should be settled for if it has any settlement value.

7. The Trustee in Bankruptcy is further ordered to sit down with Miller Brewing Company and enter into good faith settlement negotiations and discussions and to determine whether or not the matter should be settled.

8. The trustee is authorized subject to court approval to appoint an attorney to represent him if necessary in these settlement negotiations on an hourly basis if the trustee so desires.

9. The trustee is further authorized in his discretion if it is in the best interest of the estate to pursue the counterclaim in the U.S.

District Court for the District of New Hampshire and to file an application to appoint an attorney of his own choice to represent him on a contingency fee basis.

So ordered.

Dated: May 26, 1993

/s/ James A. Goodman

James A. Goodman
Bankruptcy Judge